# NIXON *v.* WARNER COMMUNICATIONS, INC., ET AL.

No. 76–944.   Argued November 8, 1977—Decided April 18, 1978

Powell, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, Blackmun, and Rehnquist, JJ., joined. White, J., filed an opinion dissenting in part, in which Brennan, J., joined, *post*, p. 611. Marshall, J., *post*, p. 612, and Stevens, J., *post*, p. 613, filed dissenting opinions.

*William H. Jeffress, Jr.*, argued the cause for petitioner. With him on the briefs were *Herbert J. Miller, Jr.*, and *R. Stan Mortenson*.

*Floyd Abrams* and *Edward Bennett Williams* argued the cause for respondents. With Mr. Abrams on the brief for

respondent National Broadcasting Company, Inc., et al. were *Eugene R. Scheiman, Corydon B. Dunham,* and *J. Laurent Scharff.* With Mr. Williams on the brief for respondent Warner Communications, Inc., were *Gregory B. Craig* and *Sidney Rosdeitcher.*

MR. JUSTICE POWELL delivered the opinion of the Court.

This case presents the question whether the District Court for the District of Columbia should release to respondents certain tapes admitted into evidence at the trial of petitioner's former advisers. Respondents wish to copy the tapes for broadcasting and sale to the public. The Court of Appeals for the District of Columbia Circuit held that the District Court's refusal to permit immediate copying of the tapes was an abuse of discretion. *United States* v. *Mitchell,* 179 U. S. App. D. C. 293, 551 F. 2d 1252 (1976). We granted certiorari, 430 U. S. 944 (1977), and for the reasons that follow, we reverse.

I

On July 16, 1973, testimony before the Senate Select Committee on Presidential Campaign Activities revealed that petitioner, then President of the United States, had maintained a system for tape recording conversations in the White House Oval Office and in his private office in the Executive Office Building. Hearings on Watergate and Related Activities Before the Senate Select Committee on Presidential Campaign Activities, 93d Cong., 1st Sess., 2074–2076 (1973). A week later, the Watergate Special Prosecutor issued a subpoena *duces tecum* directing petitioner to produce before a federal grand jury tape recordings of eight meetings and one telephone conversation recorded in petitioner's offices. When petitioner refused to comply with the subpoena, the District Court for the District of Columbia ordered production of the recordings. *In re Subpoena to Nixon,* 360 F. Supp. 1, aff'd *sub nom. Nixon* v. *Sirica,* 159 U. S. App. D. C. 58, 487 F. 2d 700

(1973). In November 1973, petitioner submitted seven of the nine subpoenaed recordings and informed the Office of the Special Prosecutor that the other two were missing.

On March 1, 1974, the grand jury indicted seven individuals [1] for, among other things, conspiring to obstruct justice in connection with the investigation of the 1972 burglary of the Democratic National Committee headquarters. In preparation for this trial, styled *United States* v. *Mitchell*,[2] the Special Prosecutor, on April 18, 1974, issued a second subpoena *duces tecum,* directing petitioner to produce tape recordings and documents relating to some 64 additional Presidential meetings and conversations. The District Court denied petitioner's motions to quash. *United States* v. *Mitchell*, 377 F. Supp. 1326 (1974). This Court granted certiorari before judgment in the Court of Appeals and affirmed. *United States* v. *Nixon*, 418 U. S. 683 (1974). In accordance with our decision, the subpoenaed tapes were turned over to the

---

[1] The seven defendants were as follows: John N. Mitchell, former Attorney General and head of the Committee for the Re-election of the President; H. R. Haldeman, former Assistant to the President, serving as White House Chief of Staff; John D. Ehrlichman, former Assistant to the President for Domestic Affairs; Charles W. Colson, former Special Counsel to the President; Robert C. Mardian, former Assistant Attorney General and official of the Committee for the Re-election of the President; Kenneth W. Parkinson, hired as the Committee's counsel in June 1972; and Gordon Strachan, staff assistant to Haldeman.

[2] Crim. No. 74–110 (DC 1974). Defendant Colson pleaded guilty to other charges before trial, and the case against him was dismissed. Strachan's case was severed and ultimately dismissed. The jury acquitted Parkinson and found Mardian guilty of conspiracy. Mitchell, Haldeman, and Ehrlichman were convicted of conspiracy, obstruction of justice, and perjury.

The convictions of Mitchell, Haldeman, and Ehrlichman were affirmed. *United States* v. *Haldeman*, 181 U. S. App. D. C. 254, 559 F. 2d 31 (1976), cert. denied, 431 U. S. 933 (1977). Mardian's conviction was reversed, *United States* v. *Mardian*, 178 U. S. App. D. C. 207, 546 F. 2d 973 (1976), and no further proceedings were instituted against him.

District Court for *in camera* inspection. The court arranged to have copies made of the relevant and admissible portions. It retained one copy and gave the other to the Special Prosecutor.[3]

---

[3] The Clerk of the District Court described the copying procedure:

"White House tape recordings were submitted to the Court pursuant to two separate subpoenas. The first group of tapes were delivered in November 1973 and the second in July and August 1974. In each instance, the Court received what purported to be the entire reel of original recording on which was found any portion of a subpoenaed conversation.

"As the time for trial in *U. S. v. Mitchell, et al.*, CR 74–110, approached, the Court reproduced subpoenaed conversations from the original recordings, using technical assistance supplied by the Watergate Special Prosecutor. Portions of conversations and, in some cases, entire conversations which the Court had previously declared to be subject to privilege were not reproduced. Two copies of each conversation were produced simultaneously and were designated Copy A and Copy B. The Copy B series was delivered to the Special Prosecutor pursuant to the subpoenas aforementioned for use in the preparation of transcripts. Copy A series tapes were retained by the Court and later marked for identification as Government Exhibits in CR 74–110. These tapes are contained on about 50 separate reels.

"In the Government's case at trial, some, but not all, of the Copy A series tapes were admitted into evidence. Some, but again not all, of the tape exhibits were published to the jury. Those published were played to the jury either in whole or in part. Where exhibits were not published in their entirety, the deletions had been made either by the Government on its own motion or pursuant to an order of Judge Sirica. Deletions were effected not by modifying the exhibit itself, but by skipping deleted portions on the tape or by interrupting the sound transmission to the jurors' headphones. The exhibits remain as originally constituted.

"The jurors were provided with transcripts of the tape recorded conversations for use as aids in listening to the exhibits. These written transcripts were marked for identification as Government Exhibits, and copies provided to the individual jurors, counsel, and news media representatives at the time the tapes were played. Deletions in the copies of transcripts used by the jurors and others matched precisely the deletions in tapes as they were published at trial.

"In many instances the Copy A series tapes introduced as Government Exhibits contain material that has not been published to the jury and

The trial began on October 1, 1974, before Judge Sirica. During its course, some 22 hours of taped conversations were played for the jury and the public in the courtroom. The reels of tape containing conversations played for the jury were entered into evidence. The District Court furnished the jurors, reporters, and members of the public in attendance with earphones and with transcripts prepared by the Special Prosecutor. The transcripts were not admitted as evidence, but were widely reprinted in the press.

Six weeks after the trial had begun, respondent broadcasters [4] filed a motion before Judge Sirica, seeking permission to copy, broadcast, and sell to the public the portions of the tapes played at trial. Petitioner opposed the application. Because *United States* v. *Mitchell* was consuming all of Judge Sirica's time, this matter was transferred to Judge Gesell.

---

others present in the courtroom." Affidavit of James F. Davey, Nov. 26, 1974, pp. 2–3; App. 24–25.

The District Court retains custody of the Copy A tapes, which are at issue here, and of the original recordings, which are not. The Copy B series is in the files of the Office of the Special Prosecutor, stored at the National Archives.

We note that under § 101 of the Presidential Recordings and Materials Preservation Act, 88 Stat. 1695, note following 44 U. S. C. § 2107 (1970 ed., Supp. V), the original tape recordings are subject to the control of the Administrator of General Services.

[4] On September 17, 1974, representatives of the three commercial television networks had written informally to Judge Sirica, asking permission to copy for broadcasting purposes portions of the tapes played during the course of the trial. Judge Sirica referred this request to Chief Judge Hart, who consulted with other judges of the District Court and advised against permitting such copying. On October 2, 1974, Judge Sirica informed the network representatives that copying would not be allowed.

The three commercial networks and the Radio-Television News Directors Association filed with the District Court this formal application to copy the tapes on November 12, 1974. The Public Broadcasting System joined the application the next day. Warner Communications, Inc., filed a separate application on December 2, 1974.

On December 5, 1974, Judge Gesell held that a common-law privilege of public access to judicial records permitted respondents to obtain copies of exhibits in the custody of the clerk, including the tapes in question. *United States* v. *Mitchell,* 386 F. Supp. 639, 641. Judge Gesell minimized petitioner's opposition to respondents' motion, declaring that neither his alleged property interest in the tapes nor his asserted executive privilege sufficed to prevent release of recordings already publicly aired and available, in transcription, to the world at large. *Id.,* at 642. Judge Gesell cautioned, however, against "overcommercialization of the evidence." *Id.,* at 643. And because of potential administrative and mechanical difficulties, he prohibited copying until the trial was over. *Ibid.* He requested that the parties submit proposals for access and copying procedures that would minimize overcommercialization and administrative inconvenience at that time. *Ibid.* In an order of January 8, 1975, Judge Gesell rejected respondents' joint proposals as insufficient. *Id.,* at 643–644. Noting the close of the *Mitchell* trial, he transferred the matter back to Judge Sirica.

On April 4, 1975, Judge Sirica denied without prejudice respondents' petitions for immediate access to the tapes. *United States* v. *Mitchell,* 397 F. Supp. 186. Observing that all four men convicted in the *Mitchell* trial had filed notices of appeal, he declared that their rights could be prejudiced if the petitions were granted. Immediate access to the tapes might "result in the manufacture of permanent phonograph records and tape recordings, perhaps with commentary by journalists or entertainers; marketing of the tapes would probably involve mass merchandising techniques designed to generate excitement in an air of ridicule to stimulate sales." *Id.,* at 188. Since release of the transcripts had apprised the public of the tapes' contents, the public's "right to know" did not, in Judge Sirica's view, overcome the need to safeguard the defendants' rights on appeal. *Id.,* at 188–189. Judge Sirica also noted the passage of the Presidential Recordings and Materials Preservation Act

(Presidential Recordings Act), 88 Stat. 1695, note following 44 U. S. C. § 2107 (1970 ed., Supp. V),[5] and the duty thereunder of the Administrator of General Services (Administrator) to submit to Congress regulations governing access to Presidential tapes in general. Under the proposed regulations then before Congress,[6] public distribution of copies would be delayed for 4½ years. Although Judge Sirica doubted that the Act covered the copies at issue here, he viewed the proposed regulations as suggesting that immediate release was not of overriding importance. 397 F. Supp., at 189.

The Court of Appeals reversed. *United States* v. *Mitchell,* 179 U. S. App. D. C. 293, 551 F. 2d 1252 (1976). It stressed the importance of the common-law privilege to inspect and copy judicial records and assigned to petitioner the burden of proving that justice required limitations on the privilege. In the court's view, the mere possibility of prejudice to defendants' rights in the event of a retrial did not outweigh the public's right of access. *Id.,* at 302–304, 551 F. 2d, at 1261–1263. The court concluded that the District Court had "abused its discretion in allowing those diminished interests in confidentiality to interfere with the public's right to inspect and copy the tapes." *Id.,* at 302, 551 F. 2d, at 1261. It remanded for the development of a plan of release, but noted—in apparent contrast to the admonitions of Judge Gessell—that the "court's power to control the uses to which the tapes are put *once released* . . . is sharply limited by the First Amendment." *Id.,* at 304 n. 52, 551 F. 2d, at 1263 n. 52 (emphasis in original). We granted certiorari to review this holding that the common-law right of access to judicial records requires the District Court to release the tapes in its custody.

---

[5] For a detailed discussion of the terms and validity of the Act, see *Nixon* v. *Administrator of General Services,* 433 U. S. 425 (1977).

[6] 40 Fed. Reg. 2670 (1975). Those regulations ultimately were disapproved. S. Res. 244, 94th Cong., 1st Sess. (1975), 121 Cong. Rec. 28609–28614 (1975). See also n. 16, *infra.*

## II

Both petitioner and respondents acknowledge the existence of a common-law right of access to judicial records, but they differ sharply over its scope and the circumstances warranting restrictions of it. An infrequent subject of litigation, its contours have not been delineated with any precision. Indeed, no case directly in point—that is, addressing the applicability of the common-law right to exhibits subpoenaed from third parties—has been cited or discovered.

### A

It is clear that the courts of this country recognize a general right to inspect and copy public records and documents,[7] including judicial records and documents.[8] In contrast to the English practice, see, e. g., *Browne* v. *Cumming*, 10 B. & C. 70, 109 Eng. Rep. 377 (K. B. 1829), American decisions generally do not condition enforcement of this right on a proprietary interest in the document or upon a need for it as evidence in a lawsuit. The interest necessary to support the issuance

---

[7] See, e. g., *McCoy* v. *Providence Journal Co.*, 190 F. 2d 760, 765–766 (CA1), cert. denied, 342 U. S. 894 (1951); *Fayette County* v. *Martin*, 279 Ky. 387, 395–396, 130 S. W. 2d 838, 843 (1939); *Nowack* v. *Auditor General*, 243 Mich. 200, 203–205, 219 N. W. 749, 750 (1928); *In re Egan*, 205 N. Y. 147, 154–155, 98 N. E. 467, 469 (1912); *State ex rel. Nevada Title Guaranty & Trust Co.* v. *Grimes*, 29 Nev. 50, 82–86, 84 P. 1061, 1072–1074 (1906); *Brewer* v. *Watson*, 71 Ala. 299, 303–306 (1882); *People ex rel. Gibson* v. *Peller*, 34 Ill. App. 2d 372, 374–375, 181 N. E. 2d 376, 378 (1962). In many jurisdictions this right has been recognized or expanded by statute. See, e. g., Ill. Rev. Stat., ch. 116, § 43.7 (1975).

[8] See, e. g., *Sloan Filter Co.* v. *El Paso Reduction Co.*, 117 F. 504 (CC Colo. 1902); *In re Sackett*, 30 C. C. P. A. 1214 (Pat.), 136 F. 2d 248 (1943); *C.* v. *C.*, 320 A. 2d 717, 724–727 (Del. 1974); *State ex rel. Williston Herald, Inc.* v. *O'Connell*, 151 N. W. 2d 758, 762–763 (N. D. 1967). See also *Ex parte Uppercu*, 239 U. S. 435 (1915). This common-law right has been recognized in the courts of the District of Columbia since at least 1894. *Ex parte Drawbaugh*, 2 App. D. C. 404 (1894). See also *United States* v. *Burka*, 289 A. 2d 376 (D. C. App. 1972).

of a writ compelling access has been found, for example, in the citizen's desire to keep a watchful eye on the workings of public agencies, see, *e. g., State ex rel. Colscott v. King,* 154 Ind. 621, 621–627, 57 N. E. 535, 536–538 (1900); *State ex rel. Ferry v. Williams,* 41 N. J. L. 332, 336–339 (1879), and in a newspaper publisher's intention to publish information concerning the operation of government, see, *e. g., State ex rel. Youmans v. Owens,* 28 Wis. 2d 672, 677, 137 N. W. 2d 470, 472 (1965), modified on other grounds, 28 Wis. 2d 685a, 139 N. W. 2d 241 (1966). But see *Burton v. Reynolds,* 110 Mich. 354, 68 N. W. 217 (1896).

It is uncontested, however, that the right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes. For example, the common-law right of inspection has bowed before the power of a court to insure that its records are not "used to gratify private spite or promote public scandal" through the publication of "the painful and sometimes disgusting details of a divorce case." *In re Caswell,* 18 R. I. 835, 836, 29 A. 259 (1893). Accord, *e. g., C. v. C.,* 320 A. 2d 717, 723, 727 (Del. 1974). See also *King v. King,* 25 Wyo. 275, 168 P. 730 (1917). Similarly, courts have refused to permit their files to serve as reservoirs of libelous statements for press consumption, *Park v. Detroit Free Press Co.,* 72 Mich. 560, 568, 40 N. W. 731, 734–735 (1888); see *Cowley v. Pulsifer,* 137 Mass. 392, 395 (1884) (per Holmes, J.); *Munzer v. Blaisdell,* 268 App. Div. 9, 11, 48 N. Y. S. 2d 355, 356 (1944); see also *Sanford v. Boston Herald-Traveler Corp.,* 318 Mass. 156, 158, 61 N. E. 2d 5, 6 (1945), or as sources of business information that might harm a litigant's competitive standing, see, *e. g., Schmedding v. May,* 85 Mich. 1, 5–6, 48 N. W. 201, 202 (1891); *Flexmir, Inc. v. Herman,* 40 A. 2d 799, 800 (N. J. Ch. 1945).

It is difficult to distill from the relatively few judicial

decisions a comprehensive definition of what is referred to as the common-law right of access or to identify all the factors to be weighed in determining whether access is appropriate. The few cases that have recognized such a right do agree that the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case.[9] In any event, we need not undertake to delineate precisely the contours of the common-law right, as we assume, *arguendo*, that it applies to the tapes at issue here.[10]

## B

Petitioner advances several reasons supporting the exercise of discretion against release of the tapes.[11]

---

[9] Cf. *State ex rel. Youmans* v. *Owens*, 28 Wis. 2d 672, 682, 137 N. W. 2d 470, 474–475 (1965), modified on other grounds, 28 Wis. 2d 685a, 139 N. W. 2d 241 (1966).

[10] See n. 11, *infra*.

[11] Petitioner also contends that the District Court was totally without discretion to consider release of the tapes at all. He offers three principal arguments in support of that position: (i) exhibit materials subpoenaed from third parties are not "court records" in terms of the common-law right of access; (ii) recorded materials, as opposed to written documents, are not subject to release by the court in custody; and (iii) the assertion of third-party property and privacy interests precludes release of the tapes to the public.

As we assume for the purposes of this case (see text above) that the common-law right of access is applicable, we do not reach or intimate any view as to the merits of these various contentions by petitioner.

Petitioner further argues that this is not a "right of access" case, for the District Court already has permitted considerable public access to the taped conversations through the trial itself and through publication of the printed transcripts. We need not decide whether such facts ever could be decisive. In view of our disposition of this case, the fact that substantial access already has been accorded the press and the public is simply one factor to be weighed.

Whatever the merits of these claims and those considered in the text, petitioner has standing to object to the release of the tapes. As the party

First, petitioner argues that he has a property interest in the sound of his own voice, an interest that respondents intend to appropriate unfairly.[12]   In respondents' view, our decision in *Nixon* v. *Administrator of General Services,* 433 U. S. 425 (1977), upholding the constitutionality of the Presidential Recordings Act, divested petitioner of any property rights in the tapes that could be asserted against the general public. Petitioner insists, however, that respondents' point is not fully responsive to his argument.   Petitioner is not asserting a proprietary right to the tapes themselves.   He likens his interest to that of a third party whose voice is recorded in the course of a lawful wiretap by police officers and introduced into evidence on tape.   In petitioner's view, use of one's voice as evidence in a criminal trial does not give rise to a license for commercial exploitation.

Petitioner also maintains that his privacy would be infringed if aural copies of the tapes were distributed to the public.[13]   The Court of Appeals rejected this contention.   It reasoned that with the playing of the tapes in the courtroom, the publication of their contents in the form of written transcripts, and the passage of the Presidential Recordings Act—in which Congress contemplated ultimate public distribution of aural copies—any realistic expectation of privacy disappeared. 179 U. S. App. D. C., at 304–305, 551 F. 2d, at 1263–1264.

--------

from whom the original tapes were subpoenaed, and as one of the persons whose conversations are recorded, his allegations of further embarrassment, unfair appropriation of his voice, and additional exploitation of materials originally thought to be confidential establish injury in fact that would be redressed by a favorable decision of his claim.   Thus, the constitutional element of standing is present.   See *Warth* v. *Seldin,* 422 U. S. 490, 498–502 (1975).

[12] Petitioner develops this argument more fully in support of his claim that the District Court lacks power to release these tapes.   See n. 11, *supra.*   The argument also is relevant, however, in determining whether the discretionary exercise of such power was proper.

[13] See n. 12, *supra.*

Furthermore, the court ruled that as Presidential documents the tapes were "impressed with the 'public trust' " and not subject to ordinary privacy claims. *Id.,* at 305, 551 F. 2d, at 1264. Respondents add that aural reproduction of actual conversations, reflecting nuances and inflections, is a more accurate means of informing the public about this important historical event than a verbatim written transcript. Petitioner disputes this claim of "accuracy," emphasizing that the tapes required 22 hours to be played. If made available for commercial recordings or broadcast by the electronic media, only fractions of the tapes, necessarily taken out of context, could or would be presented. Nor would there be any safeguard, other than the taste of the marketing medium, against distortion through cutting, erasing, and splicing of tapes. There would be strong motivation to titillate as well as to educate listeners. Petitioner insists that this use would infringe his privacy, resulting in embarrassment and anguish to himself and the other persons who participated in private conversations that they had every reason to believe would remain confidential.

Third, petitioner argues that our decision in *United States v. Nixon,* 418 U. S. 683 (1974), authorized only the most limited use of subpoenaed Presidential conversations consistent with the constitutional duty of the judiciary to ensure justice in criminal prosecutions. The Court of Appeals concluded, however, that the thrust of our decision in that case was to protect the confidentiality of Presidential conversations that were neither relevant nor admissible in the criminal proceeding; it did not relate to uses of conversations actually introduced into evidence. Since these conversations were no longer confidential, 179 U. S. App. D. C., at 305–306, 551 F. 2d, at 1264–1265, Presidential privilege no longer afforded any protection.

Finally, petitioner argues that it would be improper for the courts to facilitate the commercialization of these White House tapes. The court below rejected this argument, hold-

ing it a "question of taste" that could not take precedence over the public's right of access. *Id.*, at 306, 551 F. 2d, at 1265. Petitioner rejoins that such matters of taste induce courts to. deny public access to court files in divorce and libel litigation. See, *e. g., In re Caswell,* 18 R. I. 835, 29 A. 259 (1893); *Munzer* v. *Blaisdell,* 268 App. Div., at 11, 48 N. Y. S. 2d, at 356. Moreover, argues petitioner, widespread publication of the transcripts has satisfied the public's legitimate interests; the marginal gain in information from the broadcast and sale of aural copies is outweighed by the unseemliness of enlisting the court, which obtained these recordings by subpoena for a limited purpose, to serve as the vehicle of their commercial exploitation "at cocktail parties, . . . in comedy acts or dramatic productions, . . . and in every manner that may occur to the enterprising, the imaginative, or the antagonistic recipients of copies." Brief for Petitioner 30.

## C

At this point, we normally would be faced with the task of weighing the interests advanced by the parties in light of the public interest and the duty of the courts.[14] On respondents' side of the scales is the incremental gain in public understanding of an immensely important historical occurrence that arguably would flow from the release of aural copies of these tapes, a gain said to be not inconsequential despite the already widespread dissemination of printed transcripts. Also on respondents' side is the presumption—however gauged—in favor of public access to judicial records. On petitioner's side are the arguments identified above, which must be assessed in the context of court custody of the tapes. Underlying each of petitioner's arguments is the crucial fact that respondents require a court's cooperation in furthering their commercial

---

[14] Judge Sirica's principal reason for refusing to release the tapes— fairness to the defendants, who were appealing their convictions—is no longer a consideration. All appeals have been resolved. See n. 2, *supra.*

plans. The court—as custodian of tapes obtained by subpoena over the opposition of a sitting President, solely to satisfy "fundamental demands of due process of law in the fair administration of criminal justice," *United States* v. *Nixon, supra,* at 713—has a responsibility to exercise an informed discretion as to release of the tapes, with a sensitive appreciation of the circumstances that led to their production. This responsibility does not permit copying upon demand. Otherwise, there would exist a danger that the court could become a partner in the use of the subpoenaed material "to gratify private spite or promote public scandal," *In re Caswell, supra,* at 836, 29 A. 259, with no corresponding assurance of public benefit.

We need not decide how the balance would be struck if the case were resolved only on the basis of the facts and arguments reviewed above. There is in this case an additional, unique element that was neither advanced by the parties nor given appropriate consideration by the courts below. In the Presidential Recordings Act, Congress directed the Administrator of General Services to take custody of petitioner's Presidential tapes and documents. The materials are to be screened by Government archivists so that those private in nature may be returned to petitioner, while those of historical value may be preserved and made available for use in judicial proceedings and, eventually, made accessible to the public. Thus, Congress has created an administrative procedure for processing and releasing to the public, on terms meeting with congressional approval, all of petitioner's Presidential materials of historical interest, including recordings of the conversations at issue here.[15]

---

[15] Both sides insist that the Act does not in terms cover the copies of the tapes involved in this case. Section 101 (a) of the Act directs the Administrator to "receive, obtain, or retain, complete possession and control of all *original* tape recordings of conversations which were recorded

In *Nixon* v. *Administrator of General Services*, 433 U. S. 425 (1977), we noted two major objects of the Act. First, it created a centralized custodian for the preservation and "orderly processing" of petitioner's historical materials. Second, it mandated protection of the "rights of [petitioner] and other individuals against infringement by the processing itself or, ultimately, by public access to the materials retained." *Id.*, at 436. To these ends, the Act directed the Administrator to formulate regulations that would permit consideration of a number of different factors.[16] Thus, the Act provides for

or caused to be recorded by any officer or employee of the Federal Government and which—

"(1) involve former President Richard M. Nixon or other individuals who, at the time of the conversation, were employed by the Federal Government;

"(2) *were recorded in the White House or in the office of the President* in the Executive Office Buildings located in Washington, District of Columbia; Camp David, Maryland; Key Biscayne, Florida; or San Clemente, California; and

"(3) *were recorded during the period beginning January 20, 1969, and ending August 9, 1974.*" 88 Stat. 1695 (emphasis added).

The tapes at issue here are not "originals." See n. 3, *supra.* Nor were they recorded during the relevant period or in the designated areas.

MR. JUSTICE WHITE would direct that the copies of the tapes at issue in this case be delivered forthwith to the Administrator. He reaches this result by construing § 101 (b) of the Act, in conjunction with 44 U. S. C. § 2101, as sweeping within the ambit of the Act's provisions *copies* as well as the originals of the tapes and materials generated by petitioner during the specified period (*i. e.*, Jan. 20, 1969, to Aug. 9, 1974). Apart from the point that these copies were created after the close of that period, it is difficult to believe that § 101 (b) was intended to sweep so broadly. In any event, we need not consider in this case what Congress may have intended by § 101 (b). That section specifies duties of the Administrator. He is not a party to this case, has made no claim to entitlement to these copies, and the scope of § 101 (b) has not been fully briefed and argued.

[16] Under § 104 of the Act, the Administrator is to propose regulations governing public access to the Presidential tapes. These regulations must

legislative and executive appraisal of the most appropriate means of assuring public access to the material, subject to prescribed safeguards. Because of this congressionally pre-

---

meet with congressional approval. Section 104 provides in pertinent part as follows:

### "REGULATIONS RELATING TO PUBLIC ACCESS

"Sec. 104. (a) The Administrator shall, within ninety days after the date of enactment of this title [Dec. 19, 1974] submit to each House of the Congress a report proposing and explaining regulations that would provide public access to the tape recordings and other materials referred to in section 101. Such regulations shall take into account the following factors:

"(1) the need to provide the public with the full truth, at the earliest reasonable date, of the abuses of governmental power popularly identified under the generic term 'Watergate';

"(2) the need to make such recordings and materials available for use in judicial proceedings;

"(3) the need to prevent general access, except in accordance with appropriate procedures established for use in judicial proceedings, to information relating to the Nation's security;

"(4) the need to protect every individual's right to a fair and impartial trial;

"(5) the need to protect any party's opportunity to assert any legally or constitutionally based right or privilege which would prevent or otherwise limit access to such recordings and materials;

"(6) the need to provide public access to those materials which have general historical significance, and which are not likely to be related to the need described in paragraph (1); and

"(7) the need to give to Richard M. Nixon, or his heirs, for his sole custody and use, tape recordings and other materials which are not likely to be related to the need described in paragraph (1) and are not otherwise of general historical significance.

"(b)(1) The regulations proposed by the Administrator in the report required by subsection (a) shall take effect upon the expiration of ninety legislative days after the submission of such report, unless such regulations are disapproved by a resolution adopted by either House of the Congress during such period.

"(2) The Administrator may not issue any regulation or make any change in a regulation if such regulation or change is disapproved by either House of the Congress under this subsection.

"(3) The provisions of this subsection shall apply to any change in the

scribed avenue of public access we need not weigh the parties' competing arguments as though the District Court were the only potential source of information regarding these historical materials. The presence of an alternative means of public access tips the scales in favor of denying release.

Respondents argue that immediate release would serve the policies of the Act. The Executive and Legislative Branches, however, possess superior resources for assessing the proper implementation of public access and the competing rights, if any, of the persons whose voices are recorded on the tapes. These resources are to be brought to bear under the Act, and court release of copies of materials subject to the Act might frustrate the achievement of the legislative goals of orderly processing and protection of the rights of all affected persons. Simply stated, the policies of the Act can best be carried out under the Act itself. Indeed, Judge Sirica—as we have noted *supra*, at 595–596—referred to the scheme established under the Act in assessing the need for immediate release. 397 F. Supp., at 189; cf. *United States* v. *Monjar*, 154 F. 2d 954 (CA3 1946). But because defendants' appeals were pending, he merely denied respondents' petition without prejudice, contemplating reconsideration after exhaustion of all appeals.[17]

___

regulations proposed by the Administrator in the report required by subsection (a). Any proposed change shall take into account the factors described in paragraph (1) through paragraph (7) of subsection (a), and such proposed change shall be submitted by the Administrator in the same manner as the report required by subsection (a)." 88 Stat. 1696–1697.

The Administrator's fourth set of proposed regulations has become final. 42 Fed. Reg. 63626 (1977). The first set was disapproved, S. Res. 244, 94th Cong., 1st Sess. (1975), 121 Cong. Rec. 28609–28614 (1975), as was the second, S. Res. 428, 94th Cong., 2d Sess. (1976), 122 Cong. Rec. 10159–10160 (1976). The House rejected six provisions of a third set. H. R. Res. 1505, 94th Cong., 2d Sess. (1976), 122 Cong. Rec. 30251 (1976). See also S. Rep. No. 94–368 (1975); H. R. Rep. No. 94–560 (1975); S. Rep. No. 94–748 (1976).

[17] The suggestion of MR. JUSTICE STEVENS, *post*, at 614, that the trial court has exercised its discretion to permit release of the copies is not

Thus, he did not have to confront the question whether the existence of the Act is, as we hold, a decisive element in the proper exercise of discretion with respect to release of the tapes.

We emphasize that we are addressing only the application in this case of the common-law right of access to judicial records. We do not presume to decide any issues as to the proper exercise of the Administrator's independent duty under the statutory standards. He remains free, subject to congressional disapproval, to design such procedures for public access as he believes will advance the policies of the Act.[18]  Questions con-

---

supported by the facts. It is true that Judge Gesell declared that respondents eventually should be permitted to copy the tapes at issue here, but he imposed stringent standards to safeguard against overcommercialization and administrative inconvenience. 386 F. Supp., at 643. Respondents failed to satisfy those standards. *Id.*, at 643–644. When the matter returned to Judge Sirica, he framed the crucial issue as that of "the timing of the release, *if ever*, of certain tapes received in evidence" in the Mitchell trial. 397 F. Supp., at 187 (emphasis added). Thus, even if the defendants' appeals had not been pending, it is entirely speculative whether Judge Sirica would have exercised his discretion so as to permit release. In light of the appeals, Judge Sirica actually denied respondents' applications without prejudice. Consequently, this case is not correctly characterized as one in which the District Court and the Court of Appeals "have concurred," *post*, at 614, as to the proper exercise of discretion. Moreover, neither court gave appropriate consideration to the factor we deem controlling—the alternative means of public access provided by the Act.

[18] Section 105–63.404 (c) of the Administrator's final regulations provides in part that "[r]esearchers may obtain copies of the reference tapes only in accordance with procedures comparable to those approved by the United States District Court for the District of Columbia in *United States v. Mitchell, et al.; In re National Broadcasting Company, Inc., et al.*, D. C. Miscellaneous 74–128." 42 Fed. Reg. 63629 (1977). In fact, the District Court has not approved any procedures. Hence, this regulation may reflect the belief that the federal judiciary, in delineating the scope of the common-law right of access to the tapes at issue here, would pass on questions of proprietary interest, privacy, and privilege that could affect release under the Act. See §§ 104 (a)(5), (7), 105 (a), (c). Because we decide that the existence of the Act itself obviates exercise of the common-

cerning the constitutionality and statutory validity of any access scheme finally implemented are for future consideration in appropriate proceedings. See Nixon v. Administrator of General Services, 433 U. S., at 438–439, 444–446, 450, 455, 462, 464–465, 467; id., at 503–504 (POWELL, J., concurring).

Considering all the circumstances of this concededly singular case, we hold that the common-law right of access to judicial records does not authorize release of the tapes in question from the custody of the District Court. We next consider whether, as respondents claim, the Constitution impels us to reach a different result.

## III

Respondents argue that release of the tapes is required by both the First Amendment guarantee of freedom of the press and the Sixth Amendment guarantee of a public trial. Neither supports respondents' conclusion.

## A

In Cox Broadcasting Corp. v. Cohn, 420 U. S. 469 (1975), this Court held that the First Amendment prevented a State from prohibiting the press from publishing the name of a rape victim where that information had been placed "in the public domain on official court records." Id., at 495. Respondents

law right in this case, we have not found it necessary to pass on any such questions.

Moreover, this lawsuit arose independently of the Act, the Administrator is not a party, and any procedures that might have arisen from it would not necessarily have been developed with reference to the statutory standards the Administrator must consider. Further, there may be persons other than petitioner who may wish to assert private or public interests in the tapes themselves or in the manner of dissemination. We cannot accept respondents as necessarily representing the interests of the public generally or of the Administrator.

In sum, this litigation cannot be utilized as a substitute for the procedures and safeguards set forth in the Act, upon which we relied in Nixon v. Administrator of General Services, 433 U. S. 425 (1977).

claim that *Cox Broadcasting* guarantees the press "access" to—meaning the right to copy and publish—exhibits and materials displayed in open court.

This argument misconceives the holding in *Cox Broadcasting*. Our decision in that case merely affirmed the right of the press to publish accurately information contained in court records open to the public. Since the press serves as the information-gathering agent of the public, it could not be prevented from reporting what it had learned and what the public was entitled to know. *Id.*, at 491–492. In the instant case, however, there is no claim that the press was precluded from publishing or utilizing as it saw fit the testimony and exhibits filed in evidence. There simply were no restrictions upon press access to, or publication of, any information in the public domain. Indeed, the press—including reporters of the electronic media—was permitted to listen to the tapes and report on what was heard. Reporters also were furnished transcripts of the tapes, which they were free to comment upon and publish. The contents of the tapes were given wide publicity by all elements of the media. There is no question of a truncated flow of information to the public. Thus, the issue presented in this case is not whether the press must be permitted access to public information to which the public generally is guaranteed access, but whether these copies of the White House tapes—to which the public has never had *physical* access—must be made available for copying. Our decision in *Cox Broadcasting* simply is not applicable.

The First Amendment generally grants the press no right to information about a trial superior to that of the general public. "Once beyond the confines of the courthouse, a news-gathering agency may publicize, within wide limits, what its representatives have heard and seen in the courtroom. But the line is drawn at the courthouse door; and within, a reporter's constitutional rights are no greater than those of any other member of the public." *Estes* v. *Texas*, 381 U. S. 532, 589 (1965)

(Harlan, J., concurring). Cf. *Saxbe* v. *Washington Post Co.,* 417 U. S. 843 (1974); *Pell* v. *Procunier,* 417 U. S. 817 (1974). See also *Zemel* v. *Rusk,* 381 U. S. 1, 16–17 (1965).

## B

Respondents contend that release of the tapes is required by the Sixth Amendment guarantee of a public trial.[19] They acknowledge that the trial at which these tapes were played was one of the most publicized in history, but argue that public understanding of it remains incomplete in the absence of the ability to listen to the tapes and form judgments as to their meaning based on inflection and emphasis.

In the first place, this argument proves too much. The same could be said of the testimony of a live witness, yet there is no constitutional right to have such testimony recorded and broadcast. *Estes* v. *Texas, supra,* at 539–542. Second, while the guarantee of a public trial, in the words of Mr. Justice Black, is "a safeguard against any attempt to employ our courts as instruments of persecution," *In re Oliver,* 333 U. S. 257, 270 (1948), it confers no special benefit on the press. *Estes* v. *Texas,* 381 U. S., at 583 (Warren, C. J., concurring); *id.,* at 588–589 (Harlan, J., concurring). Nor does the Sixth Amendment require that the trial—or any part of it—be broadcast live or on tape to the public. The requirement of a public trial is satisfied by the opportunity of members of the public and the press to attend the trial and to report what they have observed. *Ibid.* That opportunity abundantly existed here.

## IV

We hold that the Court of Appeals erred in reversing the District Court's decision not to release the tapes in its custody.

---

[19] We assume, *arguendo,* that respondents have standing to object to an alleged deprivation of a defendant's right to a public trial. But see *Estes* v. *Texas,* 381 U. S. 532, 538 (1965); *id.,* at 583 (Warren, C. J., concurring); *id.,* at 588–589 (Harlan, J., concurring).

We remand the case with directions that an order be entered denying respondents' application with prejudice.[20]

*So ordered.*

MR. JUSTICE WHITE, with whom MR. JUSTICE BRENNAN joins, dissenting in part.

Although I agree with the Court that the Presidential Recordings and Materials Preservation Act is dispositive of this case and that the judgment of the Court of Appeals should be reversed, my reasons are somewhat different, for I do not agree that the Act does not itself reach the tapes at issue here. It is true that § 101 (a) of the Act requires delivery to the Administrator and his retention of only original tape recordings and hence does not reach the tapes involved here. But § 101 (b) is differently cast:

> "(b)(1) Notwithstanding any other law or any agreement or understanding made pursuant to section 2107 of title 44, United States Code, the Administrator shall receive, retain, or make reasonable efforts to obtain, complete possession and control of all papers, documents, memorandums, transcripts, and other objects and materials which constitute the Presidential historical materials of Richard M. Nixon, covering the period beginning January 20, 1969, and ending August 9, 1974.
>
> "(2) For purposes of this subsection, the term 'his-

---

[20] The task of balancing the various elements we have identified as part of the common-law right of access to judicial records should have been undertaken by the courts below in the first instance. "We need not remand for that purpose, however, because the outcome is readily apparent from what has been said above." *Bigelow* v. *Virginia,* 421 U. S. 809, 826–827 (1975).

According to the Manual for Clerks of the United States District Courts § 207.1 (1966), clerks of the District Courts should "obtain a direction, standing order or rule that exhibits be returned [to their owners] or destroyed within a stated time after the time for appeal has expired." Because we have not addressed the issue of ownership of the copies at stake in this case, we do not speak to the disposition of them after remand.

torical materials' has the meaning given it by section 2101 of title 44, United States Code."

"Historical materials" is defined in 44 U. S. C. § 2101 as "including books, correspondence, documents, papers, pamphlets, works of art, models, pictures, photographs, plats, maps, films, motion pictures, sound recordings, and other objects or materials having historical or commemorative value."

Obviously, § 101 (b) has a far broader sweep than § 101 (a). It is not limited to originals but would reach copies as well. Nor is there any question that the tapes sought to be released here contain conversations that occurred during the critical period covered by § 101 (b)—January 20, 1969, to August 9, 1974. That the tapes at issue are copies made at a later time does not remove the critical fact that the conversations on these copies, like the conversations on the originals, occurred during the relevant period. Furthermore, if the originals are of historical value, the copies are of equal significance. Otherwise, it is unlikely that there would be such an effort to obtain them.

Of course, the Administrator under the Presidential Recordings Act is not compelled to seek out every copy of every document or recording that was itself produced during the specified period of time. But surely he is authorized to receive the tapes at issue in this case and to deal with them under the terms of the statute.

It is my view, therefore, that the judgment of the Court of Appeals should be reversed, but that the case should be remanded to the District Court with instructions to deliver the tapes in question to the Administrator forthwith.

MR. JUSTICE MARSHALL, dissenting.

As the court below found, respondents here are "seek[ing] to vindicate a precious common law right, one that predates the Constitution itself." *United States* v. *Mitchell*, 179 U. S. App. D. C. 293, 301, 551 F. 2d 1252, 1260 (1976). The Court today recognizes this right and assumes that it is applicable

here. *Ante,* at 598–599, and n. 11. It also recognizes that the court with custody of the records must have substantial discretion in making the decision regarding access. *Ante,* at 599.

The Court nevertheless holds that, contrary to the rulings below, respondents should be denied access to significant materials in which there is wide public interest. The Court finds "decisive" the existence of the Presidential Recordings and Materials Preservation Act. *Ante,* at 607. The Act, however, by its express terms covers only "original tape recordings," § 101 (a), and it is undisputed that the tapes at issue here are copies, see *ante,* at 593–594, n. 3, 603–604, n. 15. Indeed, in a commendable display of candor, petitioner has conceded that the Act does not apply. Supplemental Brief for Petitioner 2.

Nothing in the Act's history suggests that Congress intended the courts to defer to the Executive Branch with regard to these tapes. To the contrary, the Administrator of General Services had to defer to the District Court's "expertise" in order to secure congressional approval of regulations promulgated under the Act. See *post,* at 616, and n. 5 (STEVENS, J., dissenting). It is clear, moreover, that Congress intended the Act to ensure "the American people . . . full access to all facts about the Watergate affair." S. Rep. No. 93–1181, p. 4 (1974).

Hence the Presidential Recordings Act, to the extent that it provides any assistance in deciding this case, strongly indicates that the tapes should be released to the public as directed by the Court of Appeals. While petitioner may well be "a legitimate class of one," *Nixon* v. *Administrator of General Services,* 433 U. S. 425, 472 (1977), we are obligated to adhere to the historic role of the Judiciary on this matter that both sides concede should be ours to resolve. I dissent.

MR. JUSTICE STEVENS, dissenting.

The question whether a trial judge has properly exercised his discretion in releasing copies of trial exhibits arises infrequently. It is essentially a question to be answered by refer-

ence to the circumstances of a particular case. Only an egregious abuse of discretion should merit reversal; and when the District Court [1] and the Court of Appeals [2] have concurred,

[1] District Judge Gesell explained the normal practice in the trial court:

"As a matter of practice in this court, if requested, a copy of any document or photograph received in evidence is made by the Clerk and furnished at cost of duplicating to any applicant, subject only to contrary instructions that may be given by the trial judge at the time of trial. This privilege of the public to inspect and obtain copies of all court records, including exhibits while in the custody of the Clerk, is of long standing in this jurisdiction and reaches far back into our common law and traditions. Absent special circumstances, *any* member of the public has a right to inspect and *obtain copies* of such judicial records. *Ex parte Drawbaugh*, 2 App. D. C. 404, 407 (1894). . . .

"The Court stated in *Drawbaugh*,

"[A]ny attempt to maintain secrecy, as to the records of the court, would seem to be inconsistent with the common understanding of what belongs to a public court of record, to which all persons have the right of access and to its records, according to long-established usage and practice.

.    .    .    .    .

"The Court has carefully reviewed transcripts of the tapes in issue. From this review it is apparent that Judge Sirica has assiduously removed extraneous material, including topics relating to national security and considerable irrelevant comment relating to persons not on trial. Only portions of the tapes strictly germane to the criminal proceeding have been played to the jury. Moreover, the portions of the tapes here in issue are now of public record. Although former President Nixon has been pardoned, he has standing to protest release by the Court but he has no right to prevent normal access to these public documents which have already been released in full text after affording the greatest protection to presidential confidentiality 'consistent with the fair administration of justice.' *United States* v. *Nixon*, [418 U. S. 683, 715 (1974)]. His words cannot be retrieved; they are public property and his opposition is accordingly rejected." *United States* v. *Mitchell*, 386 F. Supp. 639, 641–642 (DC 1974). Like the Court of Appeals, see n. 2, *infra*, and unlike the majority, *ante*, at 606–608, n. 17, I read this passage as a discretionary rejection of petitioner's claim that the tapes should be suppressed.

[2] Explaining its concurrence in Judge Gesell's views, the Court of Appeals stated:

"Beyond this, there are a number of factors unique to this case that

the burden of justifying review by this Court should be virtually insurmountable. Today's decision represents a dramatic departure from the practice appellate courts should observe with respect to a trial court's exercise of discretion concerning its own housekeeping practices.

There is, of course, an important and legitimate public interest in protecting the dignity of the Presidency, and petitioner has a real interest in avoiding the harm associated with further publication of his taped conversations. These interests are largely eviscerated, however, by the fact that these trial exhibits are already entirely in the public domain. Moreover, the normal presumption in favor of access is

---

militate in favor of Judge Gesell's decision. First, the conversations at issue relate to the conduct of the Presidency and thus they are both impressed with the 'public trust,' and of prime national interest. Second, the fact that the transcripts of the conversations already have received wide circulation makes this unlike a hypothetical case in which evidence previously accessible only to a few spectators will suddenly become available to the entire public. Finally, it seems likely that as a result of the Presidential [R]ecordings and Material[s] Preservation Act, the words and sounds at issue here will find a further entry way into the public domain. For all these reasons we are unable to conclude that Judge Gesell abused his discretion in rejecting the claim of privacy.

. . . . .

"In any event, in light of the strong interests underlying the common law right to inspect judicial records—interests especially important here given the national concern over Watergate—we cannot say that Judge Gesell abused his discretion in refusing to permit considerations of deference to impede the public's exercise of their common law rights." *United States* v. *Mitchell,* 179 U. S. App. D. C. 293, 305–306, 551 F. 2d 1252, 1264–1265 (1976) (footnotes omitted).

It is true that Judge Sirica refused to order release of the tapes before the appeals were concluded, but he expressed no disagreement with any aspect of Judge Gesell's opinion.

It should also be noted that although Circuit Judge MacKinnon dissented from the Court of Appeals decision that the tapes should be released forthwith, he also expressed no disagreement with Judge Gesell's views. *Id.,* at 306–307, 551 F. 2d, at 1265–1266.

616

strongly reinforced by the special characteristics of this litigation. The conduct of the trial itself, as well as the conduct disclosed by the evidence, is a subject of great historical interest. Full understanding of this matter may affect the future operation of our institutions. The distinguished trial judge, who was intimately familiar with the ramifications of this case and its place in history, surely struck the correct balance.

Today the Court overturns the decisions of the District Court and the Court of Appeals by giving conclusive weight to the Presidential Recordings and Materials Preservation Act, 88 Stat. 1695.[3] That Act, far from requiring the District Court to suppress these tapes, manifests Congress' settled resolve "to provide as much public access to the materials as is physically possible as quickly as possible." [4] It is therefore not surprising that petitioner responded to the Court's post-argument request for supplemental briefs by expressly disavowing any reliance on the Presidential Recordings Act. Nor is there any reason to require the District Court to defer to the expertise of the Administrator of General Services, for the Administrator gained congressional approval of his regulations only by deferring to the expertise displayed by the District Court in this case.[5] For this Court now to rely on the Act as a basis for

---

[3] It is, of course, true that the Act's effect on this litigation "was neither advanced by the parties nor given appropriate consideration by the courts below." *Ante,* at 603. But this is a reason for rejecting, not embracing, petitioner's claim.

[4] S. Rep. No. 94–368, p. 13 (1975); H. R. Rep. No. 94–560, p. 16 (1975).

[5] The Administrator of General Services first planned to forbid private copying of the tapes in his control, but the Senate emphatically rejected this initial proposal. S. Res. 244, 94th Cong., 1st Sess. (1975), 121 Cong. Rec. 28609–28614 (1975). The Senate's Committee Report condemned the Administrator's proposed regulation as "at best, unnecessary, and at worst, inconsistent with the spirit if not the letter of the act." S. Rep. No. 94–368, *supra,* at 13. The Report elaborated:

"In evaluating this regulation, it is also necessary to consider the basic intent of the Act. This legislation was designed, within certain limitations, to provide as much public access to the materials as is physically possible

reversing the trial judge's considered judgment is ironic, to put it mildly.

I respectfully dissent.

---

as quickly as possible. To that end, GSA recognizes that legitimate research requires the reproduction of printed materials; reproduction is no less necessary when the material is a tape recording." *Ibid.*

A House Report also disapproved the proposal, rejecting the Administrator's fears of undue commercialization:

"There is of course a risk that some people will reproduce the recordings and exploit them for commercial purposes. That is the risk of a free society. Moreover, it is a risk the Founding Fathers accepted in adopting the free speech protections of the first amendment, any researcher can announce to the world the findings of his research." H. R. Rep. No. 94–560, *supra,* at 16.

The Administrator then revised his regulations, proposing that private reproduction of the tapes be prohibited for two years and that the ban be reviewed at the end of that period. This proposal was rejected twice. S. Res. 428, 94th Cong., 2d Sess. (1976), 122 Cong. Rec. 10159–10160 (1976); H. R. Res. 1505, 94th Cong., 2d Sess. (1976), 122 Cong. Rec. 30251 (1976). See also S. Rep. No. 94–748, pp. 23–24 (1976); H. R. Rep. No. 94–1485, p. 26 (1976).

The Administrator finally obtained congressional approval only by adopting the approach of the District Court in this case. His latest regulation, as approved, states:

"Researchers may obtain copies of the reference tapes only in accordance with procedures comparable to those approved by the United States District Court for the District of Columbia in *United States* v. *Mitchell* . . . ." 42 Fed. Reg. 63629 (1977).

Congress and the Administrator expected that the District Court would soon approve private copying of the tapes. The first congressional Reports on the Administrator's proposed regulations, after noting that reproduction of the court's tapes had been forbidden pending the appeals in *United States* v. *Mitchell,* expressed the belief that copying might begin when the prosecutions were completed. H. R. Rep. No. 94–560, *supra,* at 16 n. 4; S. Rep. No. 94–368, *supra,* at 13 n. 1. The Administrator, in explaining his latest regulations, said that "once the Court approves a plan for reproduction of the Nixon tape recordings," the Administrator would adopt "similar procedures." General Services Administration, Legal Explanation of Public Access Regulations—Presidential Recordings and Materials Preservation Act, P. L. 93–526, p. G–54 (1977).