626 A.2d 1032

**GROUP W TELEVISION, INC., et al.**

v.

**STATE of Maryland, et al.**

**No. 300, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

July 1, 1993.

Douglas J. Connah, Jr., Nathan E. Siegel and Venable, Baetjer and Howard on the brief, Baltimore, for appellants, Group W TV, Baltimore Sun and Fox TV Stations.

Lynn Charytan and Carol Melamed, on the brief, Washington, DC, for the Washington Post.

Bruce W. Sanford, Robert D. Lystad, Stephanie S. Abrutyn and Baker & Hostetler, on the brief, Washington, DC, for

appellant, Scripps Howard Broadcasting Co. d/b/a WMAR–TV.

Lawrence P. Fletcher–Hill, Asst. Atty. Gen., J. Joseph Curran, Jr., Atty. Gen. on the brief, Baltimore, for appellee, State of Maryland.

George E. Burns, Jr., Asst. Public Defender, Stephen E. Harris, Public Defender and Nancy M. Cohen, Asst. Public Defender, on the brief, Baltimore, for appellee, Solomon.

Laurack D. Bray, David E. George, on the brief, Washington, DC, for appellee, Miller.

Argued before WENNER, FISCHER and CATHELL, JJ.

FISCHER, Judge.

In this case we are asked to decide whether members of the mass media are entitled to copy a videotape that had been introduced as an exhibit in a criminal trial. The videotape was admitted as evidence against Bernard E. Miller, who was standing trial in the Circuit Court for Howard County for the carjacking murder of Pamela Basu. Several news organizations filed motions to intervene,[1] as did Rodney Soloman, Miller's co-defendant. The media sought to obtain copies of the videotape, but Miller, Soloman, and the State argued that such dissemination of the video would impinge on the ability to conduct a fair trial. After a hearing, the court issued a twelve page opinion denying the press's request to copy the videotape. Aggrieved by this ruling, the media appeal.[2]

The underlying facts occurred on September 8, 1992, the date of Mrs. Basu's death. That morning, Mrs. Basu was

---

1. The press may intervene in a criminal trial for the limited purpose of asserting First Amendment rights. *News American v. State*, 294 Md. 30, 447 A.2d 1264 (1982); *Hearst Corp. v. State* 60 Md.App. 651, 657, 484 A.2d 292 (1984).

2. The appellant news organizations are Group W Television, Inc. The Baltimore Sun Company, Fox Television Stations, Inc., The Washington Post, and Scripps–Howard Broadcasting Co. d/b/a WMAR–TV. For convenience, we refer to the appellants collectively.

videotaped by her husband as she took their daughter to the daughter's first day of nursery school. The video shows Mrs. Basu and her daughter leaving their home and entering Mrs. Basu's automobile. Appearing in the background of the picture are two black males walking behind Mrs. Basu.

The State contends that the two males are Miller and Soloman. The State further argues that, within a few minutes of the scene depicted on the videotape, Miller and Soloman stopped Mrs. Basu's car, beat her, dragged her to her death, and threw her daughter, in a car seat, from the vehicle. During Miller's trial, the State introduced into evidence the videotape filmed by Mr. Basu, an "enhanced" videotape prepared by the Federal Bureau of Investigation, and still photographs developed from frames or images of the videotape. For purposes of this appeal, we will refer to all of these exhibits as "the videotape."

The videotape was played in open court, and the judge in no manner restricted the right of anyone present in the courtroom to see, report, or comment upon the content of the videotape. In fact, the videotape was played a second time, during a recess, for those remaining in the courtroom. Although it is impossible to know the number of reporters present in the courtroom at the time, suffice it to say that forty-three press passes had been issued for the trial and that the case was extensively reported in the Baltimore–Washington corridor [3] and received national attention as well.

Dissatisfied with merely reporting on the tape after the courtroom viewings, the media sought copies of the tape for broadcast to the public. In support of its request, the press argued that it bore a First Amendment right of access to copies of the videotape. The circuit court ruled that no such right existed under the First Amendment but that a limited right to copy public judicial records existed under the common law. This common law right, the circuit court concluded,

---

**3.** It seems that the case also served as the impetus for enactment of anti-carjacking legislation.

could be tempered by the exercise of the court's supervisory power over materials in its custody, and the decision to permit copying of the videotape rested within the sound discretion of the trial judge. The court opined that its discretion should be exercised in light of the relevant facts and circumstances of the case.

When weighing the applicable factors, the court began by acknowledging a presumption in favor of access. The court also considered the significant public interest in full opportunity to know what transpires in a courtroom. Next, the court addressed the right of Miller to receive a fair trial. The broadcast of the videotape would likely create a sensational image—one undeniable reason why the media sought the videotape. Although the court had instructed the jurors to avoid media coverage of the case, the court believed that broadcast of the videotape "will create significant extra pressures on the envelope of insulation that jurors should have prior to their deliberation and verdict." Of the 166 potential jurors in this trial, only two or three were unfamiliar with the incident giving rise to the case.

In addition to considering Miller's right to receive a fair trial, the court also considered Soloman's right to a fair trial. Soloman is scheduled to be tried, beginning August 2, 1993, in the Circuit Court for Baltimore County. He faces the death penalty. So, too, with respect to Soloman, the court was concerned that publication of the videotape could taint the jury selection process. Broadcast of the video, the court opined, would add yet another "daunting challenge" to the voir dire process in Soloman's trial.

After weighing all the factors, the court denied the media's request to copy the videotape. The court did not permanently foreclose the availability of the tape for copying, however, but instead qualified its ruling by stating that when fair trial concerns no longer exist, the tape will be made available. The fair trial implications with respect to Soloman, the court noted, should ultimately be determined by the Circuit Court for Baltimore County.

The media takes issue with the denial of its request to copy the video and argues that the court erroneously impinged on the media's constitutional and common law rights to copy court documents. If, as the media asserts, a "right" to copy court documents does exist, we must determine the origin of such a right.

The First Amendment to the United States Constitution and Article 40 of the Maryland Declaration of Rights guarantee freedom of the press as well as freedom of speech.[4] Embodied within these guarantees is the right to attend criminal trials, *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580, 100 S.Ct. 2814, 2829, 65 L.Ed.2d 973 (1980)[5]—a right that the press characterizes as a right of "access." Concomitant with this First Amendment "right of access" is, the appellants argue, a First Amendment right to copy court records.

The United States Supreme Court addressed the same argument in *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 608–610, 98 S.Ct. 1306, 1317–1319, 55 L.Ed.2d 570 (1978), where the media sought copies of audiotapes that had been admitted as evidence in the Watergate trial of John Mitchell. The press argued that it was entitled, under the First Amendment, to access—"meaning the right to copy and publish— exhibits and materials displayed in open court." *Warner Communications*, 435 U.S. at 609, 98 S.Ct. at 1317. The Court disposed of this argument, stating:

---

**4.** As the provisions of Article 40 are substantially similar to those of the First Amendment, Article 40 has been treated as *in pari materia* with the First Amendment. *Freedman v. State*, 233 Md. 498, 505, 197 A.2d 232 (1964), *rev'd on other grounds*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); *Landover Books, Inc. v. Prince George's County*, 81 Md.App. 54, 76, 566 A.2d 792 (1989). We will, therefore, address these constitutional provisions in unison, and we note that our discussion of the First Amendment applies with equal force to Article 40.

**5.** The press has no greater right to information about a trial than does the public. *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 609, 98 S.Ct. 1306, 1317, 55 L.Ed.2d 570 (1978).

In the instant case ... there is no claim that the press was precluded from publishing or utilizing as it saw fit the testimony and exhibits filed in evidence. There simply were no restrictions upon press access to, or publication of, any information in the public domain. Indeed, the press—including reporters of the electronic media—was permitted to listen to the tapes and report on what was heard. . . . Thus, the issue presented in this case is not whether the press must be permitted access to public information to which the public generally is guaranteed access, but whether these copies of the White House tapes—to which the public has never had *physical* access—must be made available for copying. . . .

'Once beyond the confines of the courthouse, a news gathering agency may publicize, within wide limits, what its representatives have heard and seen in the courtroom. But the line is drawn at the courthouse door; and within a reporter's constitutional rights are no greater than those of any other member of the public.' *Estes v. Texas,* 381 U.S. 532, 589 [85 S.Ct. 1628, 1663, 14 L.Ed.2d 543] (1965) (Harlan, J., concurring).

*Warner Communications,* 435 U.S. at 609–610, 98 S.Ct. at 1317–1319 (emphasis in original; citations omitted).[6]

The press attempts to escape the force of *Warner Communications* by pointing to several subsequent cases. It argues, first, that *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), "sharply qualified" *Warner Communications. Richmond Newspapers,* 448 U.S. at 564, 100 S.Ct. at 2820, however, addressed the narrow issue of "whether a criminal trial itself may be closed to the public upon the unopposed request of a defendant, without any demonstration that closure is required to protect the defen-

---

**6.** The Court also held that the Sixth Amendment guarantee to a public trial does not require "that the trial—or any part of it—be broadcast live or on tape to the public. The requirement of a public trial is satisfied by the opportunity of members of the public and the press to attend the trial and to report what they have observed." *Warner Communications,* 435 U.S. at 610, 98 S.Ct. at 1318.

dant's superior right to a fair trial, or that some other overriding consideration requires closure." Similarly, *Globe Newspaper Co. v. Superior Court for the County of Norfolk,* 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982), concerned the exclusion of the media and general public during the testimony of a minor victim in a sex-offense trial. So, too, *Press–Enterprise Co. v. Superior Court of California, River-side County,* 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (*Press Enterprise I* ), addressed the closure of criminal voir dire, while *Press–Enterprise Co. v. Superior Court of California, Riverside County,* 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (*Press–Enterprise II* ), discussed the closure of a preliminary hearing in a criminal case. None of these decisions addressed, as did *Warner Communications,* the right to copy evidence admitted in a criminal trial. These subsequent cases did not, therefore, limit or modify the ruling in *Warner Communications* that there exists no First Amendment right of the press or of the general public to copy trial evidence. Accordingly, our holding herein must be the same, i.e. there is no First Amendment right of the media or the public to copy trial evidence.

Maryland courts have not heretofore had occasion to consider this issue. Other cases decided by us and by the Court of Appeals have focused on the closure of court proceedings or on the closure of court files. *Hearst Corp. v. State,* 60 Md.App. 651, 484 A.2d 292 (1984), concerned the sealing of a court file until the conclusion of the trial. Such closure, of course, precluded the media from obtaining any access to court documents. Seven years after *Hearst,* the Court of Appeals decided *Baltimore Sun v. Colbert,* 323 Md. 290, 593 A.2d 224 (1991). In *Colbert,* Chief Judge Murphy discussed the trial court's closure of a pretrial proceeding in a criminal matter. Like *Hearst,* the *Colbert* decision concerned an occasion when the media had been denied any access to the proceeding. Also distinguishable from the case now before us is *Baltimore Sun v. Thanos,* 92 Md.App. 227, 607 A.2d 565 (1992), a decision on which the press relies heavily. *Thanos* involved a presentence investigation report that was admitted

into evidence, under seal, in the penalty phase of a capital murder trial. Again, the media had been denied any access to the document. In *Hearst, Colbert,* and *Thanos* the press had been completely precluded from attending court proceedings or from viewing court documents. It is this total lack of access that renders *Hearst, Colbert,* and *Thanos* inapposite to the instant case.

Here, the press was afforded the opportunity to view the videotape, not only as the tape was accepted into evidence, but also a second time during a court recess. The judge placed no restrictions on the media's reports concerning the videotape, and the judge ruled that the copies of the videotape would be denied only as long as fair trial considerations existed. The issue, therefore, was not one of access to the videotape but was one of obtaining copies of the videotape.

█ A common law right to copy judicial records and documents has been recognized. *Warner Communications,* 435 U.S. 589, 98 S.Ct. 1306. This right is not, however, absolute. "Every court has supervisory power over its own records and files, and access has been denied where court files might have been a vehicle for improper purposes." *Warner Communications,* 435 U.S. at 598, 98 S.Ct. at 1312. Ultimately, the decision to permit copying of exhibits is best left to the sound discretion of the trial court, and the trial court is to exercise its discretion in light of the relevant facts and circumstances of the particular case. *See Warner Communications,* 435 U.S. at 599, 98 S.Ct. at 1312.

█ The court weighed several factors in deciding not to release copies of the videotape. The judge noted that the media would be afforded the same opportunity as the public to view the videotape. In fact, the judge permitted a second viewing of the tape during a recess. Moreover, no limits were placed on the ability of the press to report fully on what it had observed in the video.

The court also considered the right of both Miller and Soloman to receive a fair trial. This right is of constitutional

dimensions and is guaranteed under the Sixth Amendment and under the Due Process Clause of the Fourteenth Amendment. With Miller's fair trial right in mind, the judge instructed the jury at the outset to avoid media coverage of the case. The court was nonetheless concerned that, with the trial underway, the "deeply moving and potentially sensational image" contained in the video would "likely permeate local media coverage for some time, adding to the mix of potential influences on the jury." The court concluded that broadcast of the tape "will create significant extra pressures on the envelope of insulation that jurors should have prior to their deliberations and verdict."

With regard to Soloman's right to a fair trial, the court noted the probable deleterious impact that publication of the video would have on the jury selection process. The court detailed its difficulties in obtaining a jury in the Miller case and found that those difficulties will most assuredly be compounded in the Soloman case. The court explained that, while conducting voir dire in the Miller case, several prospective jurors stated that they would be able to set aside any preconceived notions of guilt with respect to Miller but that they would be unable to do so for "the older one," Soloman. To further complicate matters, Soloman faces the death penalty. Not only have prospective jurors in the Soloman case been exposed to the extensive media coverage immediately surrounding Mrs. Basu's death, but they have also been exposed to countless press reports on the Miller trial. The court was unwilling to compound further the problems associated with Soloman's right to a fair trial.

Under the circumstances of this case, the court did not abuse its discretion in denying the media's requests for copies of the videotape. The flow of information to the public concerning the Miller trial was not restricted, and the media reported extensively on all aspects of the trial—including the videotape. The court was certainly obligated to safeguard Miller's right to a fair trial, and it could not ignore the effects

its decision may have on Soloman's right to a fair trial.[7] The judge did not forever preclude the press from obtaining copies of the tape but, instead, narrowly tailored its ruling by deciding that copies could be released when the fair trial considerations are no longer present. We perceive no reason to disturb the decision of the circuit court.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.

7. Ultimately, the fair trial implications with regard to Soloman are within the jurisdiction of the Circuit Court for Baltimore County.