**ZURICH AMERICAN INS. CO.**

v.

**RITE AID CORPORATION.**

**Civil Action No. 04–1759.**

United States District Court,
E.D. Pennsylvania.

Nov. 23, 2004.

Geoffrey W. Heineman, Laura K. Seweryn, Ohrenstein & Brown, LLP, New York City, Kenneth M. Labbate, Ohrenstein & Brown, LLP, Garden City, NY, Steven D. Johnson, Hecker Brown Sherry, Philadelphia, PA, for Plaintiff.

Anne C. Gillespie, Ballard Spahr Andrews & Ingersoll LLP, Philadelphia, PA, for Defendant.

### *MEMORANDUM OPINION*

PRATTER, District Judge.

## I.  INTRODUCTION

The substance of this case involves a petition filed pursuant to the Federal Arbi-

tration Act (the "FAA") to vacate, modify or correct an arbitration award regarding an insurance coverage dispute and a cross-petition to uphold the arbitration award. However, the Court is presently addressing, *sua sponte,* the issue of whether it is appropriate for this case to remain shrouded under seal. Both the docket and the record for this matter are currently sealed. By Order dated May 7, 2004, following the filing of Zurich's Petition to Vacate, Modify and Correct Arbitration Award, the court before which the parties then appeared granted a motion to maintain all documents filed under seal, but only to the extent that there was a private agreement between the parties who assented to it. (Sealed Docket Entry No. 6). The private agreement between the parties involves two previous and related arbitration matters. The motion was unopposed and was entered into prior to any opportunity of the court to evaluate how the parties would avail themselves of the seal or whether the case ultimately would merit such treatment.

The case was subsequently reassigned to this Court on July 1, 2004. Promptly thereafter, the Court inquired of the parties whether they continued to believe that the extraordinary "seal" treatment was necessary for this case. The parties in this litigation are Zurich American Insurance Company ("Zurich") and Rite Aid Corporation ("Rite Aid"), both of whom informed the Court that the sealing of the record was at the behest of Beth Kaplan, a former Rite Aid employee, whose claims against Rite Aid were the subject of the underlying arbitrations, during which various evidence was introduced that Ms. Kaplan desired to be kept under seal.

After reviewing the facts of the case and the underlying legal arguments, the Court, having raised the issue *sua sponte* of whether the record and the docket for this case should remain sealed, found little justification in the record for sealing the entire record. Thus, the Court informally raised the issue of unsealing the record with the parties, Zurich and Rite Aid. Neither of the parties objected to unsealing the record. However, by letter dated September 17, 2004, Beth Kaplan, a former management employee of Rite Aid, and a party to the previous underlying insurance coverage-related matter (the "Liability Arbitration Panel"), indicated through counsel for Rite Aid,[1] that she and her husband, Bruce Sholk, would not consent to unsealing the record in this case. Thereafter, during the oral argument addressing the petition by Zurich to vacate, modify and correct the arbitration award granted to Rite Aid and Rite Aid's Cross–Petition to Confirm the Arbitration Award, once again, neither Zurich nor Rite Aid indicated any opposition to unsealing the record.

Following the hearing, Rite Aid was instructed by the Court, orally and by notice dated September 29, 2004, to notify Ms. Kaplan of the oral argument regarding unsealing the record. Counsel for Ms. Kaplan subsequently contacted the Court acknowledging notice of the oral argument with regard to the Court's interest in unsealing the record. The argument regarding unsealing the record was not briefed by the parties. Additionally, despite being given ample notice of the oral argument regarding the seal, the Court did not receive any written submissions providing legal support for her arguments from Beth Kaplan, the interested party who opposed unsealing the record. Thus, no party provided substantive materials to the Court regarding the seal issue. Consequently, the Court held a hearing on October 18, 2004, attended by both the parties and

---

1. Letter to the Court from counsel to Rite Aid, dated September 17, 2004.

counsel for Ms. Kaplan, during which only Ms. Kaplan endeavored to justify maintenance of the sealed status of the record. Counsel for Ms. Kaplan provided no statutory support or persuasive, much less controlling, case law in support of her argument that all or any of the records should remain sealed.

Thereafter, by letter dated November 15, 2004, counsel for Ms. Kaplan indicated that there are no documents that she is requesting to remain inaccessible to the public that both Zurich and Rite Aid are willing to withdraw from the record. In other words, Ms. Kaplan continues to want documents sealed which Zurich and Rite Aid believe should remain as part of the record, whether under seal or not. Thus, Ms. Kaplan, Zurich and Rite Aid have not managed to reach an accommodation whereby the court procedures would be unburdened from the elaborate machinations attendant to sealed records and Ms. Kaplan would be absolved from her concerns about the availability of the underlying documents to public scrutiny.

Furthermore, following oral argument regarding the seal, and at the direction of this Court, Ms. Kaplan and her counsel reviewed the documents in the record to provide a submission in support of her position that some or all of the record should remain sealed in this matter. In the November 15, 2004 letter, counsel for Ms. Kaplan requested that eight (8) of the 166 exhibits in the record remain under seal. Those exhibits include the following:

1. The Coverage Arbitration Award, dated March 26, 2004 (Exhibit A to the Appendix for the above-captioned matter);

2. The Interim Award in the Liability Arbitration, dated November 13, 2002 (Exhibit C to Exhibit B and Joint Exhibit 8);

3. Settlement Agreement and Release between Rite Aid and Beth Kaplan, dated January 22, 2003 (Exhibit F to Exhibit B and Joint Exhibit 9);

4. Rite Aid's Pre–Hearing Statement from the Liability Arbitration Hearing, dated March 7, 2002 (Joint Exhibit 7); and

5. Federal tax returns for Bruce Sholk and Beth Kaplan (for the years 1996 through 1999) (Joint Exhibits 134 to 137).

For the reasons stated below, including the unambiguous precedents handed down by the United States Supreme Court and the Court of Appeals for the Third Circuit, this Court orders that the entire docket and record be unsealed in this matter, with the single exception of the federal tax returns for Ms. Kaplan and Mr. Sholk, Joint Exhibits 134 to 137, which shall remain under seal.

## II.  DISCUSSION

### A.  Standard Of Review

■ It is well-settled that the Court "has supervisory power over its own records and files," *see In re Cendant Corp.*, 260 F.3d 183, 192 (3d Cir.2001) (quoting *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978)), and this Court has the discretion to decide issues regarding the sealing of the record, by balancing factors both for and against access, *see Bank of Am. Nat'l Trust and Sav. Ass'n v. Hotel Rittenhouse Assocs.*, 800 F.2d 339, 344 (3d Cir.1986). Moreover, the Court

retains the power to modify or lift confidentiality orders that it has entered.... Nevertheless, simply because the courts have the power to grant orders of confidentiality does not mean that such orders may be granted arbitrarily.

*See Pansy v. Borough of Stroudsburg,* 23 F.3d 772, 784–85 (3d Cir.1994) (citations omitted). Similarly, the Court of Appeals for the First Circuit has held that,

> a protective order, like any ongoing injunction, is always subject to the inherent power of the district court to relax or terminate the order, **even after judgment.** This retained power in the court to alter its own ongoing directives provides a safety valve for public interest concerns, changed circumstances or any other basis that may reasonably be offered for later adjustment.

*Poliquin v. Garden Way, Inc.,* 989 F.2d 527, 535 (1st Cir.1993) (emphasis added). Thus, it cannot be disputed that the Court "retains the power to modify or lift protective orders that it has entered." *See In re "Agent Orange" Prod. Liab. Litg.,* 821 F.2d 139, 145 (2d Cir.1987), *cert denied sub nom,* 484 U.S. 953, 108 S.Ct. 344, 98 L.Ed.2d 370 (1987).

## B. Discussion

To put the matter of this sealed record in perspective, a summary of the facts of the underlying liability and insurance coverage arbitration matters are stated below.

Zurich issued an Employment Practices Liability Policy (the "Policy") to Rite Aid for the policy period of July 10, 1999 to July 10, 2000. Pursuant to her employment contract, Beth Kaplan, Rite Aid's former senior executive vice president of marketing, commenced an arbitration proceeding, the "Liability Arbitration Panel", against Rite Aid asserting, *inter alia,* claims for breach of contract, fraud and negligent misrepresentation. The Liability Arbitration Panel is the immediate predecessor to the "Coverage Arbitration Panel" and the issues considered by the two panels are similar and interwoven. The proceedings in both of these matters were kept confidential pursuant to the rules of the American Arbitration Association (the "AAA"). However, because a dispute arose between Rite Aid and Zurich regarding the ruling by the Coverage Arbitration Panel, Zurich brought suit under the Federal Arbitration Act in an attempt to vacate, modify and correct the arbitration award. The parties appear now to be in the process of settling the dispute arising from the ruling by the Coverage Arbitration Panel.

The Liability Arbitration Panel was explicitly charged to determine whether Rite Aid could be held liable to Ms. Kaplan on her allegations of fraud and misrepresentation stemming from the misdeeds of two high-ranking corporate insiders who were also members of the Rite Aid's board of directors. Later, the Coverage Arbitration Panel was charged with determining whether Zurich, under its policy insuring Rite Aid and pursuant to Pennsylvania law, must indemnify Rite Aid for the amounts awarded to Ms. Kaplan by the Liability Arbitration Panel.

In November 2002, the Liability Arbitration Panel found that Ms. Kaplan was entitled to damages from Rite Aid for approximately $16,000,000, less certain offsets. Zurich Petition, ¶¶ 10 and 12. Thereafter, Rite Aid sought coverage under the Policy as a result of the Liability Arbitration Panel award. On November 20, 2002, Zurich disclaimed any obligation for coverage under the Policy. Zurich Petition, ¶ 12. Subsequently, on January 28, 2003, pursuant to the arbitration clause contained in the Policy, Rite Aid served Zurich with an arbitration demand seeking to recover for the award to Ms. Kaplan. Zurich Petition, ¶ 13.

The basis for the Coverage Arbitration Panel award included the following events. During 1999, the Rite Aid Board of Directors (the "Board") discovered massive fraud that it determined was committed by

members of Rite Aid's senior executive team, including Martin Grass, then-Chairman of the Board and Chief Executive Officer, and Franklin Brown, then-Vice Chairman of the Board and Chief Legal Officer. Memorandum of Law in Support of Petition of Zurich American Insurance Company to Vacate, Modify and Correct Arbitration Award (hereafter, "Zurich Petition Memo"), pp. 2–4. Grass and Brown represented the highest ranking members of Rite Aid's inside management team. The Board dismissed Grass after it discovered he had lied to the Board and materially overstated the Company's financial position in its filings to the SEC and to the public. *See* Joint Stipulation, ¶ 10. Brown had executed guarantees for two non-recourse loans taken out by Kaplan which Kaplan believed had been approved by the entire Board (but which had not). Memorandum of Rite Aid Corporation in Opposition and In Support of Its Cross–Petition to Confirm the Arbitration Award (hereafter, the "Cross–Petition"), pp. 6–7.

As a result of the malfeasance hatched by Grass and Brown, twice during 1999, Rite Aid was forced to announce that it would need to restate its financials and earnings for the previous four years. As a result, Rite Aid announced a downward reporting of approximately $1.6 billion in earnings, which (until 2003) was the largest corporate restatement in United States history. Zurich Petition Memo, p. 2. The Liability Arbitration Panel also found that, other than Grass and Brown, none of the Board members were aware of the Bank of America loans and that the Board had not approved the payments for LTIP I and LTIP II. Liability Arbitration Panel Award, at 9. Thereafter, the Securities and Exchange Commission (the "SEC") instituted a public proceeding pursuant to the

Securities and Exchange Act of 1934 ("the '34 Act") against Rite Aid and implicated "former senior management" in this probe. Zurich Petition Memo, pp. 3–4. Grass and Brown were criminally indicted for, *inter alia,* massive accounting fraud.[2] Zurich Petition Memo, pp. 3–4. Grass pled guilty to some of the criminal charges, while Brown was convicted of 10 out of 11 of the criminal counts with which he had been charged. Zurich Petition Memo, p. 4. It was these fraudulent acts and representations of Brown and Grass that gave rise to Ms. Kaplan's demand for arbitration against Rite Aid. Ms. Kaplan contended that the fraudulent actions and gross misrepresentations by these members of the inside management team, to Kaplan personally and to the public generally, resulted in a breach of Rite Aid's contractual obligations to her.

Ms. Kaplan and Rite Aid subsequently entered into a Settlement Agreement based on the above awards (including the offsets), pursuant to which Rite Aid paid Kaplan $4,945,436, plus interest. Zurich Petition Memo, p. 6.

Counsel for Ms. Kaplan argues generally that due to her stature in the business community, the ignominy of being involved with Rite Aid, a company that committed such wanton fraud, and the embarrassment of the allegations made against her personally by Rite Aid during arguments before the Liability Arbitration Panel, at least some of the documents related to both arbitration proceedings should remain under seal, supposedly to protect her reputation and integrity. Furthermore, counsel for Ms. Kaplan has asked that the Court consider (a) the confidentiality protections provided under the rules of AAA and (b) the policy implications that the disclosure of arbitration proceedings would

---

**2.** Other senior executives were also indicted, but none of those other executives also served as members of the board of directors, as Grass and Brown did.

have on the federal policy of encouraging arbitration as a means of dispute resolution.

### 1. The Common Law Presumption.

█ There is a common law presumption of public access to judicial proceedings and records. *In re Cendant*, 260 F.3d at 192 (3d Cir.2001). This rule of public access, for both civil and criminal cases, antedates the Constitution and is described as "beyond dispute" in the precedents of the Court of Appeals for the Third Circuit. *See, e.g., Littlejohn v. BIC Corp.*, 851 F.2d 673, 677–78 (3d Cir.1988).

█ The public's right of access to judicial records and proceedings is extremely broad, envisioning "a pervasive common law right 'to inspect and copy public records and documents, including judicial records and documents.'" *In re Cendant*, 260 F.3d at 192. However, "the right is not absolute," *Littlejohn*, 851 F.2d at 678, and "may be rebutted," *See Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 662 (3d Cir.1991). To overcome the common law right of access to judicial materials,

> the party seeking closure of a hearing or the sealing of part of the judicial record bears the burden of showing that the material is the kind of information that the courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure.

*In re Cendant*, 260 F.3d at 194 (internal quotations omitted). This burden emanates from Fed.R.Civ.P. 26(c) regarding protective orders. *Leucadia, Inc. v. Applied Extrusion Tech., Inc.*, 998 F.2d 157, 164 (3d Cir.1993). With regard to uncomplicated civil matters, a court, before taking the unusual and extraordinary step of sealing the record, must clearly explain the

[c]ompelling countervailing interests to be protected, [make] specific findings on the record concerning the effects of disclosure, and provide[ ] an opportunity to third parties to be heard.

*In re Cendant*, 260 F.3d at 194 (citation omitted) (emphasis added).

### 2. Privacy Concerns.

"Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning," are not enough to require sealing of the record and "[t]he burden of justifying the confidentiality of each and every document sought to be covered by the protective order remains on the party seeking the order." *Pansy*, 23 F.3d at 786, citing *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3d Cir.1986), *cert. denied*, 484 U.S. 976, 108 S.Ct. 487, 98 L.Ed.2d 485 (1987).

Nevertheless, the Court of Appeals for the Third Circuit has also held that the interest in privacy is very important to the balancing test. *Pansy*, 23 F.3d at 787, citing *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34–36, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984). The court should try to prevent "the infliction of unnecessary or serious pain on parties." *Id.* Additionally, the court should consider whether the unsealing of the record may inflict "unnecessary and intensified pain on third parties who the court reasonably finds are entitled to such protection." *Bank of Am. Nat'l Trust and Sav. Ass'n v. Hotel Rittenhouse Assocs.*, 800 F.2d 339, 346 (3d Cir.1986), citing *United States v. Criden*, 648 F.2d 814, 829 (3d Cir.1981) (*Criden I* ). However, despite a court's concerns regarding privacy and preventing embarrassment, a party whose chief concern is embarrassment "must demonstrate that the embarrassment will be particularly serious." *Id.*

Thus, the legal standard for assessing the propriety of sealing the case record is

a finding of "compelling countervailing interests," including a requirement that the district court make specific findings on the record regarding this standard before sealing the record. *See In re Cendant,* 260 F.3d at 194. The opportunity afforded here to the parties and to Ms. Kaplan, pursuant to notice of the October 18, 2004 oral argument, would have been the opportunity for the interested parties to provide the necessary tools to this Court to make such findings, but none were tendered.

### 3. Assessing Changed Circumstances.

■ Furthermore, the district court must remain cognizant of changed circumstances during case management:

> The strong presumption of public access forces district courts to be cognizant of when the reasons supporting sealing in a specific case (if any are found) have either passed or weakened, and to be prepared at that time to unseal [the record] and allow public access. Even if sealing was proper at the time when it was initially imposed, the sealing order must be lifted at the earliest possible moment when the reasons for sealing no longer obtain.... [C]ontinued sealing must be based on current evidence to show how public dissemination of the pertinent materials now would cause the [harm claimed].

*Id.* at 196. (emphasis removed). When considering the modification of a confidentiality order, the court should use the same balancing test, with one difference:

> One of the factors the court should consider in determining whether to modify the order is the reliance by the original parties on the confidentiality order. The parties' reliance on an order, however, should not be outcome-determinative, and should only be one factor that a court considers when determining whether to modify an order of confiden-

tiality.... [R]eliance on [confidentiality] orders [will] not insulate those orders from subsequent modification or vacating if the orders were improvidently granted *ab initio.* ... Improvidence in the granting of a protective order is [a] justification for lifting or modifying the order.

*Pansy,* 23 F.3d at 790 (internal citations and quotation marks omitted).

Therefore, whether a record remains sealed is within the discretion of the district court, and the court must: (1) recognize the common law presumption of public access; (2) apply a balancing test to determine prospectively whether the material to be sealed was "the type of information normally protected ... or whether there [is] a clearly defined injury to be prevented" and (3) provide and explain its clear reasoning for sealing the record. *See In re Cendant,* 260 F.3d at 198.

In making its determination, one of the obligations of the district court is to "protect the legitimate public interest in filed materials from overly broad and unjustifiable protective orders agreed to by the parties for their self-interests." *Leucadia,* 998 F.2d at 165. Moreover, judges should "carefully and skeptically" review privately-reached confidentiality agreements that are submitted to the court for approval before approving them. *Id.* at 786. The court should not "rubber stamp" any agreement among the parties to seal the record. *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.,* 178 F.3d 943, 945 (7th Cir.1999).

### 4. Balancing Ms. Kaplan's Interests with Federal Law and Policy.

■ Since "the public's right to access judicial proceedings is not absolute," *see Littlejohn,* 851 F.2d at 678, Ms. Kaplan was given an opportunity to persuade the Court not to lift the seal from the docket

and the entire record. *See Republic of Philippines,* 949 F.2d. at 662. Neither during oral argument nor in Ms. Kaplan's counsel's post-argument two (2) page letter submission to this Court, dated November 15, 2004, was any legal argument, supported by statutory or case law, proffered justifying her argument in support of maintaining the seal on some, much less all, of the arbitration documents. Significantly, Ms. Kaplan has also failed to articulate how unsealing any of the materials could actually impact her negatively. Likewise, neither Ms. Kaplan nor either of the parties indicated any action taken by any of them in reliance on the seal order.

In general, the only arguments presented to the Court are as follows:

> The documents and testimony concern private agreements with one of its former employees, including Ms. Kaplan's Employment Agreement, employee stock option awards, testimony concerning Ms. Kaplan's role as a senior executive vice president within Rite Aid.... The documents and testimony in question concern the terms of Ms. Kaplan's employment benefits and matters in which she engaged during her employment.... Ms. Kaplan has an interest in maintaining her privacy concerning the alleged damages she incurred when employed by a public company engaged in a corporate scandal.... [Furthermore,] [a]s to Ms. Kaplan, one of the specific claims she raised in connection with her own arbitration, which also proceeded under a separate Confidentiality Agreement, was that she suffered significantly as a result of "guilt by association" with Rite Aid.

*Brief in Support at 4–5* (Sealed Docket No. 4).

The argument for protecting Ms. Kaplan's privacy is considerably weakened by the fact that the public reporting and corporate governance rules of the Securities and Exchange Commission ("SEC") require public disclosure of much of the information that the Brief in Support argues should be kept private through the sealing of the record. *See* http://www.sec.gov/about/forms/form10–k.pdf (indicating that Item 11 of the SEC's Form 10–K, a company's annual report, requires the filing corporation to provide significant executive compensation details pursuant to Item 402 of Regulation S–K). Additionally, pursuant to Item 15 of the SEC's Form 10–K and the pendant requirements of Item 601 ("Exhibits") of Regulation S–K, a corporation is required to publicly file certain important contracts and employment agreements for high-ranking executives such as Ms. Kaplan. Therefore, not surprisingly, details of Ms. Kaplan's employment agreement could be found by executing a simple Internet search and reviewing the details of Rite Aid's 2000 Annual Report for 2000. *See* Rite Aid Corporation, 2000 Annual Report at 24; http:// www.riteaid.com/company_info/investor_relations/anrpts/annual00.pdf ("Termination of Employment, Beth Kaplan") (last visited Nov. 19, 2004). And, in light of the recent, well-publicized corporate scandals and fraud perpetrated on both the public and financial community, and pursuant to the common law public policy of open disclosure standards established by the Supreme Court for legal proceedings, *see Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), allowing transparency into the unprecedented Rite Aid corporate scandal weighs heavily in favor of unsealing the record.

During oral argument, and in support of Ms. Kaplan's request that the record remain sealed, counsel for Ms. Kaplan made "broad allegations of harm" that the unsealing of the records could put her in a

position of great public ignominy and result in guilt by association if the public could easily discover that she was an integral part of the senior management structure at Rite Aid during the time period that some of the highest-ranking executives were involved in perpetrating the aforementioned fraud. *See Pansy,* 23 F.3d at 786. However, Ms. Kaplan's concerns were "unsubstantiated by specific examples" of harm that could have been provided the Court with justification to maintain more of the files under seal. *See id.* Neither the proffers by Ms. Kaplan's counsel at oral argument nor the similar intimations in counsel's post-argument submission are enough to justify sealing the record. The burden of justifying the confidentiality of every document sought to be sealed remained on Kaplan. *Id.* Thus, based on a review of the facts, including the documents requested to remain under seal and the Court's general review of the SEC's disclosure requirements, this Court has not found, nor has Kaplan's counsel offered, case law justifying sealing the documents covered by Kaplan's request.

With that being said, in coming to its decision, the Court remained mindful that Ms. Kaplan's privacy interest is very important to the balancing test. *See Pansy,* 23 F.3d at 787, citing *Seattle Times,* 467 U.S. at 34–36, 104 S.Ct. 2199. The Court has no desire to inflict unnecessary or serious concern or exposure on Ms. Kaplan. However, based on the record before it, the Court concludes that Ms. Kaplan is being hypersensitive to the effects that unsealing these records may have on her. It is also clear that the law does not support her position. Furthermore, despite the Court's concerns regarding privacy and preventing embarrassment, Kaplan was required to demonstrate that the embarrassment would be particularly serious. *See id.* Kaplan did not demonstrate to the

Court that any type of serious or actual embarrassment or other injury would befall her as a result of the unsealing of the record.

Finally, the Court must remain cognizant of changed circumstances during case management. Particularly here, upon the consideration that neither Rite Aid nor Zurich has argued in support of perpetuating the seal, the reasons supporting sealing have likely either passed or weakened. *See In re Cendant,* 260 F.3d at 196. The court may have indulged the parties at the time the motion to seal the record was filed in the first instance. However, mindful of the holding of *In re Cendant,* that the sealing order "must be lifted at the earliest possible moment when the reasons for sealing no longer obtain," this Court cannot justify a continuation of the seal because it has not been presented with persuasive, current evidence "to show how public dissemination of the pertinent materials now would cause" the potentially serious embarrassment intimated by Ms. Kaplan through her counsel. *See id.*

## III. CONCLUSION

The law is clear that it is within the Court's discretion, *sua sponte,* to unseal the record. *See In re Cendant,* 260 F.3d at 192. It is also beyond question that this Court retains the power to modify or lift seal orders that it has previously granted. *Pansy,* 23 F.3d at 784–85. Furthermore, because there exists an antecedent, extremely broad, right of access to judicial records and proceedings promoting "a pervasive common law right 'to inspect and copy public records and documents, including judicial records and documents,'" *In re Cendant,* 260 F.3d at 192, this Court intends to order the unsealing of the record.

Neither Zurich nor Rite Aid now oppose the unsealing of the record. Additionally,

Ms. Kaplan has failed to rebut the public's broad right of access. *See Republic of Philippines,* 949 F.2d. at 662, and this Court does not see any compelling countervailing interests that weigh in Ms. Kaplan's favor, *In re Cendant,* 260 F.3d at 194, despite her concerns that unspecified "others" may consider her guilty by association due to her prior position and tenure at Rite Aid.[3] Moreover, a considerable amount of information concerning details of Ms. Kaplan's employment agreement, her compensation and the Rite Aid corporate scandal already has been disseminated in the public domain. The burden of rationalizing the confidentiality of each document sought to be sealed remained with Ms. Kaplan. *See Pansy,* 23 F.3d at 786. Therefore, because Ms. Kaplan has not presented this Court with a persuasive argument based on the legal standards set forth above, other than the federal tax returns of Bruce Sholk and Beth Kaplan, Joint Exhibits 134 to 137, the docket and entire record shall be unsealed.

Therefore, for the reasons stated above, the prior Order sealing the record in this matter shall be VACATED and the Clerk of the Court will be instructed to (1) unseal the docket, (2) unseal all of the underlying records (except for the personal tax returns) and (3) subsequently docket all of the submissions filed in this matter. An appropriate Order follows.

### *ORDER*

AND NOW, this ___th day of November, 2004, pursuant to the *sua sponte* inquiry of the Court with respect to unsealing both the docket and the record in the above-captioned matter and upon consideration of the arguments posed by counsel for Beth Kaplan, a former employee of the Rite Aid Corporation ("Rite Aid"), and her husband, Bruce Sholk, and the letter to the Court, dated November 15, 2004, from counsel for Ms. Kaplan and Mr. Sholk requesting that certain documents within the record remain under seal, it is hereby ORDERED:

1. The Order of May 7, 2004, sealing the record in this matter shall be VACATED;

2. The Clerk of the Court is instructed to (1) unseal the docket, (2) unseal all of the underlying records except for the personal tax returns listed below and (3) the Clerk shall docket all of the submissions filed in this matter; and

3. The federal tax returns of Bruce Sholk and Beth Kaplan (for the years 1996 through 1999), Joint Exhibits 134 to 137, shall remain under seal.

It is so ORDERED.

---

**3.** Nor does this Court believe that (1) the confidentiality procedures of the American Arbitration Association and/or (2) the federal policy of encouraging arbitration trump the clear law and policy standards established by the United State Supreme Court and the Court of Appeals for the Third Circuit for maintaining open and accessible records of legal matters for public scrutiny. It is also very telling that neither Rite Aid nor Zurich, who also have a significant self-serving, private interest in maintaining secrecy over their respective business decisions, have opposed the Court's clear concern about its duty to unseal the docket and entire record.