32 So.3d 1050 (2010)
In re Marian Prud'homme KEMP.
No. 45,028-CA.
Court of Appeal of Louisiana, Second Circuit.
March 3, 2010.
*1051 Snellings, Breard, Sartor, Inabnett & Trascher, L.L.P. by Wendy E. W. Giovingo, Monroe, for Appellant, Vacques Prud'homme.
Crawford & Joyce by Brian E. Crawford, Monroe, for Appellee, John R. Joyce.
Sir Clyde Lain, II, Monroe, for Appellee, Eugene Kemp.
Before WILLIAMS, GASKINS and DREW, JJ.
GASKINS, J.
Vacques Prud'homme, the undercurator for the person of his interdicted sister, Marian Prud'homme Kemp, appeals from a trial court judgment denying his motion to unseal the annual accounting of the interdict's property. For the following reasons, we affirm the trial court judgment.

FACTS
Marian Prud'homme Kemp was the mother of four children. Melanie Prud'homme was born April 13, 1991; her father is Cager Pruitt. LaShara James was born July 13, 1994; her father is John James. Marian then married Calvin Kemp. The couple had two more daughters, Kitty Kemp, born in June 1996, and Lillian Kemp, born in March 1998.
On August 1, 2001, Marian and all four children were in a car that collided with a Kansas City Southern (KCS) train in Arcadia, Louisiana. Kitty Kemp was killed and the three remaining children suffered various injuries. Marian suffered brain damage and was rendered permanently incapacitated. A lawsuit was eventually instituted in Missouri against KCS.
A family battle ensued for control of Marian, the children, and their potential recovery against KCS. Several days after the accident, Lydia Prud'homme, Marian's stepmother, obtained letters from the court in Bienville Parish naming her as *1052 provisional tutor of Marian and the children. Shortly thereafter, pursuant to pleadings filed by Calvin, the letters of tutorship were terminated.
In March 2002, Calvin instituted interdiction proceedings in Lincoln Parish and was named Marian's curator. Eugene Kemp, Calvin's father, was named undercurator. Eugene is domiciled in East Baton Rouge Parish.
At some point, Calvin was convicted of a criminal offense and was sentenced to a period of incarceration. In December 2002, a joint petition was filed on behalf of Calvin, Eugene, and Vacques Prud'homme, Marian's brother. They asserted that Calvin was no longer in a position to serve as curator of Marian. They sought to have Eugene named curator of Marian and tutor of the minor children. Vacques Prud'homme was named undercurator and undertutor.[1] An order to that effect was signed by the trial court in December 2002.
After some attempts by Calvin to have Eugene and Vacques removed from their respective positions, Eugene and Vacques filed a petition for the appointment of a curator of the property of the interdict and a tutor for the property of the minors. On April 21, 2005, a hearing was held. In a judgment signed by the trial court in May 2005, John R. Joyce was appointed as provisional curator of the property of Marian Prud'homme Kemp and provisional tutor of the property of the minors, Melanie Prud'homme and Lillian Kemp. Eugene was instructed to resign as curator and tutor of the property of the interdict and the minors. Vacques was ordered to resign as undercurator and undertutor of the property of the interdict and the children. Eugene remained as the curator and tutor of the persons of the interdict and the minors and Vacques remained as the undercurator and undertutor of the persons of the interdict and the minors.
Mr. Joyce was ordered to nominate a financial institution to serve as co-curator for the property of the interdict and the minors. In September 2005, pursuant to a joint motion by Eugene, Calvin, Vacques, and Mr. Joyce, Hibernia National Bank was named co-curator and co-tutor of the property of the interdict and the minors.
The lawsuit against KCS Railroad in Missouri proceeded and in December 2006, Mr. Joyce was given permission by the court in Lincoln Parish to negotiate a settlement in the suit. After an eight-week trial, a settlement was reached while the jury deliberated. Marian received $8,266,130.23 in the settlement. In March 2007, the trial court signed an order allowing Mr. Joyce to create a trust for Marian with Capital One Bank as the trustee. Capital One declined to be the co-curator and co-tutor of the property. All the settlement funds received by Marian were placed in trust.[2]
Marian had been living in a nursing home in Monroe, Louisiana. After the settlement, the trust purchased a house for her. In October 2007, Marian was moved into the house along with her children, Melanie and Lillian. Vacques and his wife, Tammy, and their children also moved into the house to care for Marian and the minors. Vacques and Tammy filed suit in Ouachita Parish and were granted sole custody of Melanie and Lillian.
In June 2008, Mr. Joyce filed the first annual accounting as curator of the property *1053 of Marian, covering the period from February 28, 2007, through March 31, 2008. Mr. Joyce noted that there was no undercurator for the property of the interdict and the accounting had not been provided to any other party. Mr. Joyce requested that the accounting be filed with the court only and sealed from the public record, alleging that this was necessary for Marian's privacy, and because no other party had a legal right to the information in the accounting. Noting that a homologation was not required, Mr. Joyce requested that the trial court approve the accounting. The trial court in Lincoln Parish signed an order approving the accounting and allowing it to be sealed from the public record. A second accounting was filed covering the period from April 1, 2008, to December 31, 2008. Mr. Joyce again requested that the trial court approve the accounting and seal it from the public record. On February 25, 2009, the trial court approved the accounting and sealed it from the public record "pending further order of this Court." The trial court also specified that notice was to be served on all counsel of record in this matter.
In October 2008, Vacques and Eugene filed a motion in Lincoln Parish to unseal the annual accounting of Marian's property, arguing that the information was necessary for child support proceedings and that no legal basis was provided to seal the accounting.
On December 15, 2008, a hearing was held in the trial court on the motion to unseal the accounting. In May 2009, a judgment was filed denying the motion to unseal the annual accounting of Marian's trust. The trial court noted that only the accounting had been sealed in this matter, not the entire record. The court found that Vacques, as undercurator of the person of the interdict, had no right to her financial records. Citing the "significant and complicated history between the parties involved in these proceedings," the trial court found that Vacques did not need the accounting to fulfill his duties and responsibilities to the interdict. However, the trial court specified that Eugene, as the curator of Marian's person, could examine a copy of the accounting at the clerk of court's office during regular business hours. Apparently as a further safeguard on the operation of the trust, the trial court appointed Teresa Culpepper Carroll to determine whether there had been any possible misuse of the interdict's funds. On June 5, 2009, Eugene appointed his attorney to examine the accounting.
Vacques appealed from the trial court judgment denying the motion to unseal the accounting.[3]

*1054 SEALING THE TRUST ACCOUNTING
In his brief to this court, Vacques argues that the trial court erred in refusing to unseal the trust accounting. He contends that the public's right to access outweighs the interdict's expectation of privacy. He also claims that the restrictions on the access to the court record are overly broad.

Legal Principles
The Louisiana Constitution has an "open courts" provision which mandates that all courts shall be open. La. Const. art. 1, § 22. Additionally, La. Const. art. 12, § 3 provides that no person shall be denied the right to observe the deliberations of public bodies and to examine public documents, except in cases established by law. The right of access to public records is to be liberally construed in favor of unrestricted access. When doubt exists about the right to access certain records, the doubt must be resolved in favor of the public's right to see. A claim of annoyance, embarrassment, oppression, or undue burden or expense is not enough to overcome the public's right of access to public records. Copeland v. Copeland, XXXX-XXXX (La.10/16/07), 966 So.2d 1040; Davis v. Davis, 43,490 (La.App.2d Cir.10/22/08), 997 So.2d 149.
However, the fact that a document is filed in the court record does not necessarily mean that it will be accessible by the public. In commenting on a court's records, the United State Supreme Court held that the right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files and that access has been denied where court files might have become a vehicle for improper purposes. The Court declined to identify all the factors to be weighed in determining whether such access is appropriate, but recognized that the discretion as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case. Nixon v. Warner Communications, Inc., 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), Copeland v. Copeland, supra.
Louisiana has no specific statute providing for sealing court records. Trial courts exercise this power under general provisions on courts' authority to govern proceedings. La. C.C.P. art. 191 provides that a court possesses inherently all of the power necessary for the exercise of its jurisdiction even though not granted expressly by law. Further, La. C.C.P. art. 1631(A) states that the court has the power to require that the proceedings shall be conducted with dignity and in an orderly and expeditious manner, and to control the proceedings at the trial, so that justice is done. Copeland v. Copeland, supra; Davis v. Davis, supra.
Even without a statute exempting certain court proceedings and documents from public review, the constitutional right of access is not unlimited. La. Const. art. 1, § 5 provides in pertinent part that every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. This provision protects certain documents and information from disclosure. See Copeland v. Copeland, supra.
In the Copeland case, the court recognized that the right to privacy is defined as the right to be let alone and to be free from unnecessary public scrutiny. However, the court has also defined the limits on the right to privacy, reasoning that the right to privacy is not absolute; it is qualified by the rights of others. The right of privacy is also limited by society's right to be informed about legitimate subjects of public interest. The court went on to *1055 note that individuals involved in civil litigation may be compelled to give evidence which tends to embarrass them or to produce documents of a confidential nature. Copeland v. Copeland, supra.
In Copeland v. Copeland, supra, the Louisiana Supreme Court recognized a balancing test to be used in analyzing the competing constitutional rights:
Considering the strong constitutional bias in favor of open access by the public to court proceedings, we find the trial court's blanket order sealing the entire record in this case to be overbroad. Although there may be some justification for sealing certain sensitive evidence in a proceeding, the parties have the burden of making a specific showing that their privacy interests outweigh the public's constitutional right of access to the record. The trial court, should it grant such relief, must ensure that its order is narrowly tailored to cause the least interference possible with the right of public access.
The court in Copeland noted that this balancing test properly subjects a request to have the record sealed to the trial court's discretion, which has supervisory power over its own records and files, placing the burden of proof on the parties seeking closure, and balancing the parties' privacy interests against the public's constitutional rights of access to court proceedings and documents.
The duties of a curator regarding accountings are set forth in La. C.C.P. art. 4569(A) which provides:
A. A curator with responsibility for affairs of the interdict shall file an account annually, upon the termination of his office, and at any other time ordered by the court. A curator with responsibility for the person of an interdict shall file a personal report describing the location and condition of the interdict annually, upon the termination of his responsibilities, and at any other time ordered by the court. At the time of filing, the curator shall send copies of any required account or personal report by first class United States mail postage prepaid to the undercurator and any successor curator. The provisions of Articles 4393 and 4398 shall apply to accounts by curators.
Regarding undercurators, La. C.C. art. 393 provides:
The court shall appoint an undercurator to discharge the duties prescribed for him by law. The duties and powers of an undercurator shall commence upon qualification. In discharging his duties, an undercurator shall exercise reasonable care, diligence, and prudence and shall act in the best interest of the interdict.
The duties of an undercurator are listed in La. C.C.P. art. 4565:
A. (1) The court shall appoint as undercurator the qualified person best able to fulfill the duties of his office. The person appointed as undercurator qualifies by taking an oath to discharge faithfully the duties of his office.
(2) At any time prior to qualification, the court may revoke the appointment for good cause and appoint another qualified person.
(3) If a person fails to qualify within ten days from his appointment or within the period specified by the court, the court on its own motion or on motion of any interested person, may revoke the appointment and appoint another qualified person. The delay allowed for qualification may be extended by the court for good cause.
B. The undercurator shall:
(1) Notify the court when the curator has failed to qualify timely for office.

*1056 (2) Have free access to the interdict and to all records relating to the interdict relevant to his office.
(3) Review all accounts and personal reports filed by the curator.
(4) Notify the court when he has reason to believe that the curator has failed to perform any duties imposed by law, including the duties to file necessary accounts and personal reports, and to maintain adequate security.
(5) Approve or disapprove any transactions that require his concurrence.
(6) Move to appoint a successor for a curator who becomes disqualified or whose office terminates.
C. The undercurator shall have no duties, either express or implied, other than those set forth in this Article and in Civil Code Article 393.

Discussion
Vacques pointed out in the trial court that there was no undercurator of the property and that there was no mechanism for safeguarding the trust because it is sealed from the public record. In this case, where there is no protection of an undercurator of the property and the curator of the property has not furnished a bond, Vacques argued that he should be given access to the accounting to serve as a check on the administration of the trust. Vacques urged that in this case, the expectation of privacy is low. The trustee is a national financial institution and a trust committee reviews the holdings and expenditures. He claimed that the safety and welfare of the interdict were not at issue in this case.
Vacques maintained that the restrictions on access to the court record are too broad. He claimed that, if closure of the record is justified, the relief must be narrowly tailored to protect the privacy interest asserted.
Mr. Joyce urged that the interdict's interests of privacy and financial protection required that the accounting be sealed. Mr. Joyce maintained that Vacques does not need access to the financial records in order to fulfill his duties and responsibilities to the interdict as undercurator of her person. He also noted that the curator of the person of the interdict has been allowed to examine the accounting.
Mr. Joyce argued that Vacques wants control of the trusts for both the interdict and the minors. He asserted that it is imperative from the history of this case that an independent provisional curator be continued to protect the interests of the beneficiaries from the control of persons who would not manage those funds or the affairs of the beneficiaries properly.
Mr. Joyce cited the long history of conflict between the Kemp and Prud'homme families regarding the administration of the affairs of the interdict and the minor children. Mr. Joyce pointed out that there has been no allegation that he, as provisional curator for the property, mismanaged it or that funds have not been wisely and prudently expended for the aid, comfort and needs of the interdict and the children.
Mr. Joyce claimed that Capital One resigned as trustee because of the constant interference by Vacques with the trust activities. According to Mr. Joyce, Vacques made unreasonable demands for his own personal benefit that went beyond the benefit of the persons for whom the trusts were solely created. Mr. Joyce pointed out that Vacques is paid a salary by the trusts.[4]
*1057 We find that, based upon the facts presented in this case, the trial court did not abuse its discretion in refusing to unseal the trust accounting. Given the family history at issue here and the maneuvering by various members of the interdict's family to control both her person and her property, the provisional curator for the property made a specific showing that the interdict had a significant interest in being secure from the unreasonable invasion of her privacy as to the trust operations.
The trial court order was narrowly drawn and allowed the curator of the person to view the accounting. As a further safeguard, the trial court appointed Teresa Culpepper Carroll to determine whether there had been any possible misuse of the interdict's funds. These measures provide a check on the use of the funds in the trust as well as furnishing the proper parties all necessary information for the child support proceedings regarding the interdict's children.
Vacques has failed to demonstrate that he has a right or need to view the trust accounting which outweighs his sister's privacy interest. He has made no specific allegations that the needs of his sister have not been met. As set forth above, there are several means by which the functioning of the trust is checked to ensure proper administration. The court examined and approved the accounting. As argued by Vacques, a trust committee from the trustee bank reviews the holdings and expenditures of the trust. The curator of the person of the interdict has been allowed to review the accounting.
La. C.C.P. art. 4565(B)(2) provides that the undercurator shall have free access to the interdict and to all records relating to the interdict relevant to his office. The revision comment (c) to the provision states that an undercurator's access to records is limited to those "relevant to his office." For example, an undercurator appointed to monitor a curator of the interdict's property does not need access to the interdict's medical and personal records. In this case, the accounting is not a record relevant to the office of the undercurator of the person of the interdict.
La. C.C.P. art. 4565(B)(3) provides that the undercurator shall review all accounts and personal reports filed by the curator. However, in this matter it is important to note that Vacques is the undercurator only of the person of the interdict, not her property. Therefore, his duty to review extends only to those matters affecting the person of the interdict.
Based upon the facts before us, the trial court did not abuse its discretion in sealing the accounting from the public record and allowing only the curator of the person of the interdict to view it at the clerk of court's office. Accordingly, the trial court judgment is affirmed.

CONCLUSION
For the reasons stated above, we affirm the judgment of the trial court denying the request by Vacques Prud'homme, the undercurator of the person of his interdicted sister, Marian Prud'homme Kemp, to unseal the account of the interdict's trust. *1058 All costs in this court are assessed to Vacques Prud'homme.
AFFIRMED.
WILLIAMS, J., dissents with written reasons.
WILLIAMS, J., dissents.
Copeland v. Copeland, XXXX-XXXX (La.10/16/07), 966 So.2d 1040 is controlling here.
Neither the lower court nor the provisional curator of the property has stated a compelling reason to deny the motion to unseal the annual accounting of the interdict's property. Thus, the public's right to access to this public record must prevail.
NOTES
[1] Eventually, LaShara James went to live with her father. She is no longer at issue in this matter.
[2] On February 25, 2009, the trustee was changed to JPMorgan Chase.
[3] In September 2008, Vacques, as the undercurator of the interdict's person, also filed a motion to change the venue of the interdiction proceedings to Ouachita Parish. He alleged that he, the interdict, her children, and the provisional curator of the interdict's property are all domiciled in Ouachita Parish. The trust owns property in Ouachita Parish and child support proceedings for the minors have been filed against the trust in Ouachita Parish. On February 19, 2009, the trial court in Lincoln Parish denied the motion for change of venue. Vacques appealed the denial of the motion for change of venue along with the motion to unseal the accounting and consolidated the issues on appeal. On October 1, 2009, this court gave the parties 15 days to file supplemental briefs on the question of whether the venue judgment was an appealable, final judgment. On November 6, 2009, this court issued an order of partial dismissal, dismissing the appeal as to the interlocutory venue judgment, but maintaining the appeal on the issue of sealing the trust accounting. Therefore, only the issue regarding the sealed accounting is before this court on appeal.
[4] On April 3, 2009, Vacques filed a motion for change of curator of the person and the property, seeking to have himself named as curator of both. Vacques asserted that, without access to the interdict's property, he cannot provide the needed services for her as undercurator. He claimed that he had to employ a CPA to assist in securing funding from the interdict's trust to provide Marian with appropriate care. He asserted that Eugene, the curator of the interdict's person, has not seen her in more than two years. Vacques sought to be named curator of both the person and the property of the interdict, with Tammy Prud'homme as the undercurator of the person of the interdict and Gwendolyn Y. Chisley as the undercurator of the interdict's property. A rule to show cause was set for May 18, 2009. The record does not show if the hearing was held and a judgment rendered.